651 P.2d 868

**STATE of Arizona, Appellee,**

v.

**John J. FEATHERMAN, Appellant.**

**No. 1 CA–CR 5042.**

Court of Appeals of Arizona,
Division 1, Department A.

June 10, 1982.

Rehearing Denied Aug. 23, 1982.

Review Denied Sept. 21, 1982.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, Chief Counsel, Crim. Div., Greg A. McCarthy, Asst. Attys. Gen., Phoenix, for appellee.

Levenbaum, Cohen & Kelman by Warren G. Levenbaum, Charles M. Sabo, Phoenix, for appellant.

## OPINION

FROEB, Judge.

The defendant was convicted of second degree murder in violation of former A.R.S. §§ 13–451, –452, –453 and –454, following a trial by jury, and was sentenced to serve a term of imprisonment in the Arizona State Prison of not less than 14 nor more than 45 years. He raises two issues for our consideration: whether the trial court erred in admitting evidence that the defendant had hit the victim over the head with a baseball bat two months prior to her disappearance, and whether the trial court erred in allowing the state to present testimony of specific violent acts committed by the defendant in rebuttal to the testimony of his character witnesses.

The evidence at trial revealed that: on April 2, 1977, a dead body was found by police detectives at 107th Avenue and Orangewood in Phoenix. The body was located in a wash in a garbage dump, and was observed by Detective Kinman lying face down, covered by a piece of cardboard and the backseat of a car. The Maricopa County Medical Examiner was called to the scene and determined that the body was female and in a highly decomposed state. The body was taken to the medical examiner's office for further examination, and was identified by dental records to be the remains of Twyla Featherman. The cause of death could not be determined due to the state of decomposition of the body.

Twyla Featherman had been reported to the Phoenix Police Department as missing on October 22, 1976. On November 11,

1976, Detective Thompson of the Phoenix Police Department spoke with the defendant who, at that time, was the estranged husband of Twyla Featherman. The defendant told Detective Thompson that he had been with Twyla on the night of October 21, 1976, which was the night she disappeared. He said they had had some drinks and dinner, and then Twyla told the defendant that she wanted to go to the Neutral Corner Bar which was owned by the defendant. They arrived at the bar around 10:30 or 11:00 P.M., but found it to be closed. According to defendant, shortly after their arrival at the bar, Twyla stated that she had to leave and, after making a phone call, refused a ride from the defendant and left the bar on her own, never to be seen again. At the time the body of Twyla Featherman was discovered, some five and one-half months later on April 2, 1977, the defendant was vacationing in Las Vegas with his new wife, Glenda Featherman. When he returned and discovered that Twyla's body had been found, the defendant called the sheriff's office to advise them that he was available if needed. He was interviewed at the sheriff's office on April 13, 1977, and repeated the same story which he had told Detective Thompson in November 1976. At that time, he also told the sheriff's officers that his marriage to Twyla had been dissolved in December 1976 and that he had married Glenda Featherman in January 1977. He told the officers that his marriage to Twyla had been rocky and that he had "slapped her a few times."

On August 12, 1978, Glenda Featherman, then married to the defendant, contacted the Maricopa County Sheriff's Department advising them that she wished to make a statement regarding the disappearance of Twyla Featherman. After being granted use immunity by the County Attorney's Office, Glenda gave a statement to the sheriff's department implicating the defendant in the murder of Twyla Featherman. Glenda Featherman and the defendant were divorced on March 20, 1979.

At trial, Glenda Featherman gave lengthy testimony which we here only summarize. She testified that at 4:00 A.M., on October 22, 1976, she received a phone call from the defendant, whom she was dating at that time. He asked that she come to the Neutral Corner Bar. When she arrived there she saw the body of Twyla Featherman lying on the floor. Thereafter, Glenda helped the defendant dispose of Twyla's body at the dump at 107th Avenue and Orangewood. On the way home from the dump, the defendant explained to Glenda that he killed Twyla by pressing on pulse points at her temples until she lapsed into unconsciousness. He would allow her to return to consciousness and after he did this numerous times, she simply did not recover. In further testimony, Glenda Featherman related that she followed directions given to her by the defendant out of fear of his threats made against her and her son. After an incident in August 1978, she filed for divorce and following further threats against her life as well as her son, she finally went to the police and gave her story.

Misti Weaver, Twyla's daughter from a previous marriage who lived with the defendant and Twyla during their marriage, testified as follows:

A. Yes. They had a rocky marriage; they fought a lot. John would come home, beat her up after he went out, got drunk. Wake us kids up, beat her up.

Q. Did you see this?

A. Yes, quite a few times.

Q. When he would beat her up, what would he use? How would he be hitting her?

A. His fists.

Q. You say this happened quite a few times during the course of this marriage?

A. Yes.

Q. Towards the end of the marriage, in 1976, did the relationship between your mother and John Featherman change any?

A. It got worse.

Q. Did you see the signs of any injuries on your mother as a result of these beatings?

A. Yes, I did.

Q. Misti, calling your attention to the latter part of August, 1976, around August 29 or August 30, 1976, did you and your mother finally—or did your mother finally move out of the house that she lived at with Johnny Featherman?

A. Yes, she did after he hit her over the head with a baseball bat.

On motion of defense counsel, the trial court ordered the statement concerning the baseball bat incident stricken and told the jury to disregard it. Defendant also moved for a mistrial on the grounds that the witness had not personally seen this event but had heard of it from another person and that it was a prior bad act and prejudicial. The trial court denied the defense motion for a mistrial based on the state's assertion that admissible evidence of the baseball bat incident would be presented. The court determined that proper evidence of the baseball bat incident would be admissible pursuant to rule 404(b), Rules of Evidence, to prove the defendant's intent and/or motive.

The next person to testify about the baseball bat incident was Sheri Savage, a friend of Twyla Featherman, who took Twyla to Phoenix Baptist Hospital in August 1976 for treatment of wounds to her head. Over the objection of the defendant, Savage testified that she had heard Twyla tell the doctor that her husband beat her on the head with a baseball bat. Savage also testified that within five days after this incident, she confronted the defendant with regard to the baseball bat incident:

Q. What did you say to him? What did he say to you regarding this baseball bat incident?

A. I asked him why he beat her in the head with a baseball bat. I told him that he could have killed her.

He told me that he wanted to kill her, that he was so upset with her, all he could see was her big mouth running. He walked in the family room, he picked up the baseball bat, he wanted to kill her, he was very upset with her. He said he could have put her body out in the desert and the police would have thought it was another sex slaying.

Q. Did he indicate to you why he was upset with her?

A. He said—I asked him if he was drinking, and he told me no, he hadn't been drinking; he was stone cold sober. But when he got home that morning, about four or five o'clock, whatever it was, she jumped on him, and they had an argument, and he lost his temper.

Q. Did he indicate to you what the argument was, if you can remember? Yes or no?

A. It was over another woman.

Savage also stated that approximately a week after she had taken Twyla to Phoenix Baptist Hospital, she took her to see a Dr. A. E. Zachow concerning the head injuries.

Dr. Zachow testified that he removed the sutures from Twyla's scalp on September 7, 1976. He recalled Twyla having said something to him to the effect that she had sustained the injuries while horseback riding. He did not recall a mention of the baseball bat and stated that if Twyla had mentioned a baseball bat, he would have suggested another form of treatment including X-rays. He also testified that the injuries which he saw on Twyla's head were not consistent with being struck on the head by a baseball bat because there was no indentation.

Dr. Melvin Phillips testified for the defense that he had known Twyla and the defendant for many years. He stated that he had never noticed any injuries on Twyla and that he had never seen the defendant do anything violent. He also never observed any sign that Twyla was afraid of the defendant. He examined the hospital records concerning Twyla's treatment for the head injury and stated that the records were not consistent with Twyla's having been hit on the head with a baseball bat.

John Featherman, Jr., the son of the defendant, testified in reference to the alleged baseball bat incident on cross-examination as follows:

Q. In fact, the day before she left, your father beat her, didn't he?

A. No.

Q. Do you recall you were cleaning up and placing her in the bath tub or helping your father place her in the bath tub so the blood wouldn't get all over the living room?

A. No.

Q. Do you recall telling Misti that?

A. No.

Q. Do you recall doing it?

A. I didn't do it.

Q. Do you recall telling Misti that that night you had heard a commotion and you came downstairs and your mother was down on the floor on her back?

A. No.

Q. You don't recall that?

A. I didn't tell her that.

Q. Do you recall telling her that you had pulled your father off your mother?

A. No.

## ADMISSIBILITY OF THE BASEBALL BAT INCIDENT

For his first claim of error, the defendant argues that the evidence concerning the baseball bat incident was improperly admitted. He contends that the incident does not fall within an exception of rule 404(b), Rules of Evidence, that the evidence of the baseball bat incident was insufficient to allow its introduction, and that the prejudicial effect of the admission of the evidence outweighed its probative value. The state asserts that the defendant waived any claim of error arising out of the admission of the baseball bat incident because of a failure to object at trial, that in any event the incident was admissible pursuant to rule 404(b), and that the evidence was sufficient to allow the testimony. Finally, the state concludes that even if the trial court erroneously admitted the testimony concerning the baseball bat incident, the error was harmless.

▮ Arizona Rule of Evidence 404(b) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may,

however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Evidence that the defendant has committed certain bad acts other than those for which he is on trial is generally inadmissible because it is irrelevant and because of the danger of unfair prejudice to the defendant. However, the relevance of a prior bad act may outweigh the prejudice to the defendant "if the illegal conduct does more than discredit the character of the defendant." *State v. Rose,* 121 Ariz. 131, 136, 589 P.2d 5, 10 (1978). Prior bad acts are therefore admissible in order to prove the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. "In all these situations the bad acts shed some light on the crime charged and not merely on the defendant's criminal propensity." *Id.* Before evidence of a separate crime or offense may be admitted, "there must be evidence of that other crime substantial enough to take that case to a jury, ... although it need not be proof beyond a reasonable doubt." *State v. Marahrens,* 114 Ariz. 304, 307, 560 P.2d 1211, 1214 (1977). Finally, the question of whether other bad acts are too misleading or prejudicial to be admissible is left to the discretion of the trial court. *State v. Rose, supra.*

In the present case, the defendant initially objected to the testimony of Misti Weaver concerning the baseball bat incident immediately following her testimony. The trial court ordered that the answer be stricken, and recessed for an in-chamber conference where the defendant moved for a mistrial on the grounds that the testimony constituted an improper reference to a prior bad act, and because the evidence was insufficient to take the case to a jury. After inquiring what further evidence the state would introduce on the issue, the trial court concluded that the evidence would be sufficient to take the case to a jury, and that the incident was admissible to prove intent and motive. We conclude that the

trial court did not err in denying the motion for a mistrial.

■ The defendant was charged in this case with murder under former A.R.S. §§ 13–451 and –452. The state tried the case on a first degree theory which required proof that the defendant acted with malice aforethought and that the killing was "willful, deliberate and premeditated." The evidence of the baseball bat incident which occurred two months prior to the murder was relevant to the issue of whether the defendant acted with malice in killing the victim. Furthermore, the incident was not too remote from the offence charged to be relevant. In *State v. Denny,* 27 Ariz.App. 354, 555 P.2d 111 (1976), this court held that the trial court properly admitted evidence that the defendant attempted to assault her husband with a car five months prior to the time she killed him. In *Denny* the prior bad act was admissible because we concluded that it showed "malice and intent and motive" of the defendant. 27 Ariz.App. at 359, 555 P.2d at 116. In the same case, this court held that the trial court erred in allowing evidence that the defendant had shot her prior husband twenty-two months before the crime for which she was being tried. We concluded that the evidence of the shooting of the prior husband was inadmissible because it was introduced only to show that the defendant had such a predisposition and was acting in conformity with that trait of character when she murdered the subsequent husband.

In the present case the evidence of the defendant's hostility to his victim demonstrated by the baseball bat incident two months prior to her death is directly relevant to his intent the night she was killed. Intent is frequently shown by evidence of other criminal acts of the same character. *State v. Rose, supra. See also State v. Tostado,* 111 Ariz. 98, 523 P.2d 795 (1974); *State ex rel. Berger v. Superior Court,* 108 Ariz. 396, 499 P.2d 152 (1972). We find that the evidence of the baseball bat incident was admissible pursuant to rule 404(b), Rules of Evidence.

■ We also find that the baseball bat incident was shown by substantial evidence. Sheri Savage testified that she heard the victim tell the physician at Phoenix Baptist Hospital that the cause of the injury was that the defendant hit her over the head with a baseball bat. The hospital records reflect that the statement was made. Both Savage and Patsy Blackham observed the victim's head injury. Finally, Savage testified that the defendant admitted that he had hit the victim over the head with a baseball bat. We find that sufficient evidence was presented as to this incident to render it admissible. *State v. Marahrens, supra.*

■ Finally, the state contends that the defendant waived the issue by his failure to object at trial. We conclude that the defendant did not waive the issue. He objected as soon as Misti Weaver referred to the incident. He immediately moved for a mistrial, asserting the grounds that he now asserts on appeal. While he did not continue to object to every subsequent reference to the baseball bat incident, we conclude that his motion for a mistrial was sufficient to preserve the issue for purposes of appeal.

## STATE'S REBUTTAL EVIDENCE

The primary defense at trial was the defendant's good character. Many witnesses testified on behalf of the defendant concerning his reputation or their opinion of his nonviolent character. In response, the state presented evidence in the form of opinion and reputation evidence that the defendant was violent. The defendant testified in his own behalf, and on cross-examination by the state testified that he did not have a quick temper and that he tried to be easy-going. He also testified that he had, upon occasion, been in bar fights. The state questioned the defendant concerning the occurrence of a fight between him and a man named Ernie Flaaen over the defendant's coaching of a Pop Warner football game. The defendant stated that he did not challenge Ernie Flaaen to fight. The state, in rebuttal, called Ernie Flaaen to the witness stand, and Flaaen testified that on

that particular occasion, the defendant raised his fist at Flaaen, assumed a boxer stance, and said something about fighting. Flaaen also testified concerning his opinion that the defendant was violent.

The defendant also testified about a bar fight in which he was involved, and when asked if Patsy Blackham witnessed this fight, he testified that she did not. He further testified that he had a disagreement with Patsy concerning how she kept statistics for Pop Warner football, but denied that he was going to hit her during the course of that discussion. In rebuttal, the state called Patsy Blackham to the witness stand and she testified that she did observe the defendant threaten to hit a man in the bar, and that he also threatened to hit her concerning the football statistics on a different occasion. The defendant did not object to the testimony of either Ernie Flaaen or Patsy Blackham.

On appeal, the defendant contends that the introduction by the state of the specific instances of misconduct to prove the defendant's character for violence was error. The state argues that the defendant has waived the claim of error by his failure to object at trial; that the testimony was properly admitted pursuant to rule 405(b); and that even if the admission of the rebuttal testimony was error it was harmless.

The basic rule concerning the admissibility of past misconduct evidence is set forth in rule 404(b) quoted earlier. Rule 405 provides the method of proving character when character evidence is admissible pursuant to rule 404. Rule 405 states:

(a) *Reputation or opinion.* In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(b) *Specific instances of conduct.* In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

Thus, character may be proved by testimony concerning a person's reputation or by testimony in the form of a witness's opinion. Only in certain instances, however, are specific instances of conduct admissible to prove character. Specific instance testimony may be inquired into and evidence admitted only on cross-examination pursuant to rule 405(a), or in cases in which character or a trait of character is "an essential element of a charge, claim, or defense" pursuant to rule 405(b).

We are not here called upon to decide whether the rebuttal testimony would, under any theory, be admissible in evidence over the defendant's objection. There was no objection. The defendant's argument is that reversal is required even when the testimony was not objected to because of its prejudicial nature. For this, the defendant relies upon *State v. Johnson,* 94 Ariz. 303, 383 P.2d 862 (1963); *State v. Price,* 106 Ariz. 433, 477 P.2d 523 (1970), and *State v. Ballantyne,* 128 Ariz. 68, 623 P.2d 857 (App. 1981). *Johnson* and *Price* predate the Rules of Evidence adopted in 1977, but nevertheless provide general guidance. It should be noted, however, that in Arizona prior to the 1977 Rules of Evidence a character witness could not be cross-examined as to specific instances of conduct. *Viliborghi v. State,* 45 Ariz. 275, 43 P.2d 210 (1935). The fact that the opposite is now true throws a somewhat different light upon the subject of past conduct evidence, and prior Arizona cases must be read with this in mind.

*State v. Johnson* and *State v. Price* hold to the principle that, even absent objection, it is reversible error for the state to make inquiry of past conduct of the defendant because of its prejudicial nature. It is noteworthy that in both of those cases, unlike the present case, there *were* objections to the rebuttal evidence involving specific acts, but no objection had earlier been made by the defendant when the state inquired about past conduct during cross-examination. In *State v. Ballantyne,* no objection was made either to cross-examination or to rebuttal evidence of specific acts introduced

by the state. The court of appeals found no objection was necessary to preserve the error, relying upon *State v. Price.*

 In neither *Johnson, Price* nor *Ballantyne* did the defendant place his character and reputation in issue and we therefore focus upon this distinction in evaluating the claim of fundamental error.[1] In the present case, the defendant's character and reputation were very much in issue. That fact, coupled with the propriety of the state's cross-examination involving specific acts, defeats the argument that we should reverse because the error was fundamental. We hold, in this situation, that objection to the evidence was required in order to preserve the error for appeal. Since there was no objection here, there was no reversible error. In other words, if the defendant presents evidence that he is nonviolent and a person of good character, the rules of evidence allow the state to show to the contrary both by way of cross-examination as to specific acts and by witness testimony concerning opinion and reputation. The rules do not permit the state to rebut with specific instances of past conduct, but if such testimony is erroneously offered, the defendant must object to preserve the error.

As a separate argument on this issue, the state contends that specific instances of conduct were in fact admissible pursuant to rule 405(b) because the defendant made trait of character for nonviolence an "essential element of his defense." *See State v. Miller,* 128 Ariz. 112, 624 P.2d 309 (App. 1981); *State v. Lehman,* 126 Ariz. 388, 616 P.2d 63 (App.1980). We need not reach this question, however, in light of our disposition of the issue under the preceding discussion.

 The last issue raised by the defendant is that, based on the entire record, the prejudicial effect of the evidence relating to the baseball bat incident and the rebuttal testimony as to specific instances of conduct by the defendant substantially outweighed its probative value and denied the defendant a fair trial. Rule 403. After reviewing the entire case, we reject this contention. There was a great deal of evidence on both sides concerning whether the defendant was peaceful or violent. The subject was at the center of the case. The defendant testified that he had been involved in approximately half a dozen bar fights. Evidence was presented through the testimony of Sheri Savage, Misti Weaver, Loren Le Moine and Glenda Featherman that the defendant had assaulted Twyla Featherman and Loren Le Moine the night before Twyla's disappearance. Glenda Featherman testified that the defendant assaulted her in August 1978. Misti Weaver testified that the defendant had hit Twyla with his fists numerous times prior to her death. Other persons testified that they had observed Twyla with injuries. The evidence of the Patsy Blackham incidents and Ernie Flaaen incident was clearly cumulative to the other evidence. Moreover, the trial in this case was lengthy and the Patsy Blackham and Ernie Flaaen evidence consumed only a very small portion of the trial. Lastly, the state's case rested on the testimony of Glenda Featherman. The rebuttal testimony by Patsy Blackham and Ernie Flaaen did not corroborate or reflect on her testimony in any way. It is clear that, except as to evidence of premeditation, the jury believed her testimony in arriving at its verdict. We are unable to say that the evidence was so prejudicial that the trial court abused its

1. The introduction of the prejudicial evidence in each of these three cases was for the purpose of *impeachment.* Impeachment was also involved in this case, but it was combined with proof of character. The issue raised by defendant in this appeal relates to the introduction of prior conduct evidence to prove character and implicates rules 404 and 405. We point out that the impeachment side of the issue implicates rule 608(b) which states that "specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than a conviction of crime as provided in rule 609, may not be proved by extrinsic evidence." We make no attempt in this opinion to disentangle these two aspects of prior conduct evidence. Suffice it to say that defendant's reliance on *Johnson, Price* and *Ballantyne* is based on the effect of admitting instances of prior conduct regardless of whether they are introduced for impeachment/ or proof of character.

discretion in deciding that its probative value justified its admission.

For the foregoing reasons, the judgment and sentence are affirmed.

CORCORAN, Acting P. J., and HAIRE, J., concur.