# Supreme Court of the Navajo Nation

**Navajo Nation, Plaintiff,**

v.

**Peter MacDonald Sr., Defendant.**

**Decided December 30, 1991**

## OPINION

Before TSO, Chief Justice, BLUEHOUSE and AUSTIN, Associate Justices.

Carol K. Retasket, Esq., Window Rock, Navajo Nation (Arizona), and Ronald J. Yengich, Esq., Salt Lake City, Utah, for the defendant; and Richard Hughes, Esq., Special Prosecutor for the Navajo Nation, Santa Fe, New Mexico, for the plaintiff.

Opinion delivered by Tso, Chief Justice.

This is an appeal from the October 17, 1990 jury verdicts and the October 22, 1990 judgments of conviction of Peter MacDonald Sr. (MacDonald). He was convicted on 41 criminal counts, including charges of bribery in official matters, use of office for personal gain, conflicts of interest, taking official action on matters where there is a personal interest, and conspiracy to violate those criminal laws. On appeal, MacDonald makes twelve assignments of error.

The record of this case is large, and the briefs filed by the parties are extensive. For simplicity and economy in rendering an opinion, the issues are restated as follows:

1. Was the petit jury properly constituted and selected?
   a. Was the jury randomly selected, and was it representative of the community?
   b. Did the trial court abuse its discretion in the manner in which it permitted challenges to jurors?
2. Was MacDonald denied the right to counsel by conflicts of attorney-client interests, either by the method of attorney compensation or attorney performance?
   a. Did the method of attorney compensation by the Navajo Nation, and events surrounding its negotiation, create a conflict of interest which caused ineffective assistance of counsel?
   b. Did a sealed motion, filed with the trial court, constitute a conflict of interest?

    c. Was counsel's performance at the trial level ineffective, and did it reflect a conflict of interest?

3. Was the evidence admitted at trial competent, relevant, and fair, and was there substantial evidence to support the jury verdicts?

    a. Was testimony on governmental procedures and business arrangements irrelevant and prejudicial?

    b. Was MacDonald impermissibly denied the right to confront witnesses, and did hearsay testimony fall within exceptions to the hearsay rule?

    c. Was the evidence presented to the jury sufficient to prove each and every element of the offenses charged, beyond a reasonable doubt?

    d. Does the record show cumulative trial errors which denied MacDonald a fair trial, or does it show instances of harmless error?

4. Did the trial court use excessive charges to impose double punishment upon MacDonald, and did it impose cruel and unusual punishment upon him?

    a. Did multiple criminal charges violate prohibitions against double punishment and subject MacDonald to double jeopardy?

    b. Is a sentence of five years, and 335 days in jail for 41 violations of Navajo Nation criminal law cruel and unusual punishment?

This Court's standard of review in criminal cases focuses upon the essential fairness of the proceedings. The Court will examine any error, whether or not it is raised by a defendant, which is plain and affects substantial rights, or if review is necessary to avoid grave injustice. *Navajo Nation v. Platero*, 6 Nav. R. 422, 428 (1991). In order to reverse a conviction, there must be prejudicial error. That sort of error must affect and deny substantial rights, but where it is harmless in its effect, it will be disregarded. *Id.* Where constitutional or quasi-constitutional rights are not involved, we decide whether, in light of all admissible evidence, the jury's finding of guilt is clearly correct. *Id.* at 428. Criminal convictions and the application of the Navajo Nation Bill of Rights will be reviewed in light of the fundamental principles of Navajo common law. *Id.* at 424; *Bennett v. Navajo Board of Election Supervisors*; 6 Nav. R. 319, 324 (1990).

# I. SELECTION OF THE JURY

## A. The Fair Cross Section Requirement

MacDonald argues that Austin Dawes, a court clerk, "arbitrarily hand picked" prospective jurors, on the basis of race, and that the jury was not a fair cross section of the community. The Navajo Nation replies that MacDonald demanded a "constitutional" jury panel and for that reason, the court used voter lists of the Navajo Nation and Arizona's Apache and Navajo Counties to select prospective jurors. The parties agree that *George v. Navajo Tribe*, 2 Nav. R. 1 (1979), and the jury eligibility statute, 7 N.T.C. § 654, require a jury composed of both Navajos and non-Navajos. The "Dawes Method" was to pick names at random from the

Navajo Nation voter list, based on age and residence, and to pick individuals from county voter registration lists using last names which appeared to be non-Indian. Jurors drawn from the Navajo Nation list are members of the Navajo Tribe, while those from county lists could be Navajos (because many Navajos have Anglo last names) or non-Navajos. They could be Indian or non-Indian, which voter registration lists do not disclose.

The requirement that a jury must be a fair cross section of the community comes from the United States Supreme Court ruling in *Glasser v. United States*, 315 U.S. 60 (1942). The rule was applied to the states in *Duncan v. Louisiana*, 391 U.S. 145 (1968). The standards for the rule are found in *Taylor v. Louisiana*, 419 U.S. 522 (1975), and they are as follows: 1) juries must be drawn from a source which is fairly representative of the community, but need not mirror it; 2) all defendants may assert the right, including people who are not members of an excluded group (i.e. Indians can challenge the exclusion of non-Indians from juries); and 3) a defendant can prevail by showing a systematic exclusion of distinctive groups of people; but not an occasional mistaken exclusion. The groups which must not be excluded include "large distinctive groups" and "[i]dentifiable segments playing major roles in the community." 2 Lafave & Israel, *Criminal Procedure* § 21.2(d) (1984). These rules will be applied in Navajo courts.

MacDonald initiated the jury selection process used here, and he cannot induce errors and then complain of them. *Navajo Nation v. MacDonald and concerning Moeller et al.*, 6 Nav. R. 222, 234 (1990). Tribal courts have unique problems selecting juries. If tribal rolls or voter registration lists are used, defendants will complain about the exclusion of nonmember Indians or non-Indians as distinctive groups or identifiable segments of the community. If tribes use county voter registration lists, on-reservation nonmember Indians will challenge being summoned for jury duty, and off-reservation individuals will contest the authority of a tribal court to summon them. It is difficult to cull motor vehicle license or registration lists, assuming they are available, due to the same considerations.

The Dawes Method of selecting the array does not violate any of the rules set forth above. It is genuinely random and satisfies the fair cross section requirement. There is no evidence that the selection was race-based. Instead, it guaranteed that the jury drawn for MacDonald would not be composed solely of tribal members. It was reasonably representative of communities found within the Window Rock District, and it achieved that goal in a random manner.

The proper procedure is to challenge the array or jury panel, addressing the entire panel, in writing. The burden will be on the defendant to show that the jury does not satisfy the fair cross section requirement, which caused prejudice. Minor irregularities in drawing the panel will be disregarded.

## B. Jury Selection Process

MacDonald argues that the trial court erred when it required him to exhaust his peremptory challenges before allowing him to use challenges for cause.

Specifically, he says that he was forced to use his last peremptory challenge to remove Delbert Brown, who was ineligible because he did not reside in the district. MacDonald says that his challenge for cause against Robert Ramirez was then denied, although Ramirez had been "exposed to immunized testimony." At that point, there was no peremptory challenge to use on Ramirez.

We agree with MacDonald that the trial court erred, however, it is harmless error. The record shows, first, while Ramirez was selected as an alternate, he was not a member of the actual jury which decided the case; second, the alleged "immunized testimony" to which Ramirez was "exposed" was a newspaper story about Peter MacDonald Jr.'s testimony before a Senate Investigations Committee regarding the code term "golf balls," in a wholly separate matter - the Big Boquillas Ranch purchase; and third, there is nothing in the record to indicate that Ramirez had his mind made up about MacDonald's guilt, and "[i]t is sufficient if a juror can lay aside his impression or opinion and render verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).

Parties have three peremptory challenges and unlimited challenges for cause. 7 N.T.C. § 655. Peremptory challenges are controlled by statute, and errors in denying them are not questions of constitutional law. *Ross v. Oklahoma*, 487 U.S. 81 (1988). There is nothing in the Indian Civil Rights Act or Navajo Nation Bill of Rights which require them. MacDonald cannot point to any fixed and firm practice regarding how courts require parties to use their peremptory challenges. In some jurisdictions, the parties are required to use them as each juror is individually selected. This denies the party an opportunity to compare individuals before exercising the challenge. 2 LaFave & Israel, *Criminal Procedure* § 21.3(d) (1984).

The prevailing practice is for the prosecutor to call and examine the whole number of jurors (six in the Navajo Nation), exercise challenges for cause and peremptory challenges, then replace those excused. At the end of the prosecution voir dire, the whole number of jurors is tendered to the defendant, who then follows the same process. Voir dire continues until the parties have exhausted their challenges or are satisfied with the jury. *Id.*

In the "struck jury system," jurors are examined and challenged for cause by both sides, with excused jurors being replaced, until there is a panel composed of the regular number of jurors, plus an additional number to match the number of peremptory challenges available to all parties. This process permits a more intelligent use of peremptory challenges. None of these methods is required, and trial judges have the discretion to determine the order and method in which peremptory challenges may be used. 3 *Wharton's Criminal Procedure* § 465 (12th ed. 1975). The rule we set is Navajo trial judges may not require parties to exhaust their peremptory challenges first, before permitting a challenge for cause.

## II. RIGHT TO COUNSEL

The right to counsel in the Navajo Nation Bill of Rights includes the right to effective assistance of counsel. This right is also guaranteed by the Navajo common law. The traditional Navajo "trial" involved affected individuals "talking" about the offense and offender to resolve the problem. The alleged offender had the right to have someone speak for him. *Boos v. Yazzie*, 6 Nav. R. 211, 214 (1990). The effectiveness of a speaker (and there could be more than one) was measured by what the speaker said. If the speaker spoke wisely and with knowedge while persuading others in their search for consensus, that indicated effectiveness. If the speaker hesitated, was unsure, or failed to move the others, that person was not a good speaker and thus was ineffective. The substance of what was said determined if the speaker was effective. This Navajo cultural standard is stricter than that required by the Indian Civil Rights Act, just as the Navajo courts have gone beyond that Act by appointing members of the Navajo Nation Bar Association to provide pro bono defense services to indigents. *See, id.* We have examined the record to see how those who spoke for MacDonald acted.

### A. The Method of Compensation as a Conflict of Interest

MacDonald's appellate counsel attacks the conduct of trial counsel (Randall Roberts and Val R. Jolly), essentially saying that their repeated attempts to withdraw from the case and to make an arrangement with the Navajo Nation for the payment of their fees created a conflict of interest, which raised a presumption of ineffective assistance of counsel. The Navajo Nation noted that MacDonald changed his approach at the time of oral argument, by asserting acts of purported incompetence which were not addressed in his brief. Appellate counsel obviously recognized that he must couple the showing of a conflict of interest with actual incompetence. That is, incompetence must be tied to and flow from the conflict of interest. There must be a nexus between a conflict of interest and incompetent conduct of the trial counsel.

The federal constitutional standards to determine ineffective assistance of counsel are outlined in *United States v. Cronic*, 466 U.S. 648 (1984), and *Strickland v. Washington*, 466 U.S. 668 (1984). The parties agree that the *Strickland* standards are dispositive, and there is a good discussion of them in Hall, *Professional Responsibility of the Criminal Lawyer* § 4.2 (1987). There are performance and prejudice components to the standards, and one of the prejudice components is that "[p]rejudice may be presumed in some limited situations." Hall at pp. 64-66. The component which is relevant to this assignment of error is presumptive prejudice in a conflict of interest between an attorney's financial interest and his duties to the accused.

The first presumption the federal cases require is a "'strong presumption' that the conduct of counsel in a criminal case falls within the wide range of reasonable professional assistance or competence." Hall at § 4.4. In addition, "[p]reju-

dice can be presumed in some limited situations where counsel is totally absent or prevented from assisting the accused or where counsel is burdened by an actual conflict of interest. While prejudice may be presumed, that only satisfies the second *Strickland* requirement - the first requirement of actual incompetence must be shown." *Id.*

We deal with two kinds of conflict of interest - a conflict due to attempts to withdraw for nonpayment of fees, and a conflict because of payment by a third party. We extensively addressed the first conflict in *Navajo Nation v. MacDonald concerning Moeller, et al.,* 6 Nav. R. 222, and most of the argument on this issue is based upon that decision. Professional ethics prohibit financially adverse relations between an attorney and client, and the payment of an attorney's fee by others creates an inherent danger of a conflict of interest. Hall at §§ 12.11, 12.13. The ethical standard is that an attorney may not be compensated by a third person unless (1) the client consents after full disclosure, (2) the arrangement does not interfere with the attorney's professional judgment or the attorney-client relationship, and (3) the attorney-client privilege is not violated. Hall at § 6.8.

Even before we affirmed the district court's denial of their motions to withdraw, the defense lawyers were negotiating with the Navajo Nation to assure their fees. A September 20, 1990 letter from Jolly acknowledges a Navajo Nation offer to provide compensation for this case. The letter shows that MacDonald was involved in the process, "because it recites his desire that the Navajo Nation pay his defense lawyers." The letter asks that the Navajo Nation not be reimbursed from his deferred compensation benefits. Another letter, written the following day, contains the same discussion. Jolly was acutely aware of a possible financial conflict of interest, because he refused to agree to an arrangement for payment from MacDonald's deferred compensation fund. Obviously, the deferred compensation would be paid "in the foreseeable future" if MacDonald was convicted at trial.

On September 28, 1990, two days after our ruling on the motions to withdraw, the trial court entered its order for compensation, based upon the discussions of counsel. It provided that the Navajo Nation would advance fees to Roberts and Jolly, payable on a weekly basis, and that the Navajo Nation had a right of recovery from MacDonald in the future. MacDonald obviously knew what was happening and he went along with the arrangement. He now says in his brief that "he objected vigorously to the ... order," however, that statement is not supported by the record. There is no conflict of interest here, so the presumption does not arise. There is no showing MacDonald did not consent to the arrangement (other than complain about the eventual possibility of paying the Navajo Nation back for taking care of his responsibility to pay his lawyers), and nothing to show that there was any impairment of the free exercise of professional judgment or the attorney-client privilege.

## B. The Sealed Motion

Appellate counsel also argues that a sealed document Jolly filed with the trial court on the first day of trial shows a conflict of interest. The document relates to press accounts of MacDonald complaining about the competence of his attorneys. It contains a rebuttal to the press accounts, showing the efforts Jolly and his associates made to prepare for trial. It also shows a specific awareness and concern on their part that MacDonald be given effective assistance. They wanted to make a reliable record of their efforts in the event of later claims of ineffective assistance. While there was some quibbling of counsel at oral argument about whether it was a professional tactic, it was a permissible one. Where a client claims that an attorney is not providing effective assistance, the attorney-client privilege is waived to the extent necessary for a lawyer to defend himself. Hall at § 10.14. Roberts and Jolly were most likely aware that they would be attacked on appeal, and the sealed document was their method of protecting their professional reputations and preserving the record. The trial court and opposing counsel did not know what was in the document, and it had no effect on the jury. The sealed document did not create a conflict of interest.

## C. Ineffective Assistance of Counsel

The issue here is whether there is actual incompetence by MacDonald's defense counsel, considering all the circumstances. The answer lies in making a fair assessment of performance without hindsight, applying the presumption of effectiveness, examining specific errors, and acknowledging the role of strategic trial decisions. Neither the appellant's brief nor oral argument have shown them, so we have used the other assignments of error as the basis for our examination. They show that MacDonald`s attorneys made many strategic and tactical choices, and nothing in the record overcomes the presumption of effectiveness. Strategic choice is the overall plan, or theory of the case, and tactical choices are made as specific problems in a case occur. In the withdrawal case, Roberts and Jolly boasted that they had fifteen years experience prosecuting and defending criminal cases. The trial record shows that, and MacDonald received some very aggressive and competent representation. We find that they spoke for MacDonald wisely, and with knowledge, consistent with a traditional Navajo "talking things out" session. Planning is an important Navajo value, and the record shows the defense was prepared and planned well.

We next decide whether any error or deficiency in defense counsel's performance was prejudicial to MacDonald. The burden is on MacDonald to show that there is a reasonable probability that, but for unprofessional errors, the outcome would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. We make this determination on the totality of the evidence as shown by the record, because MacDonald has not pointed to any evidence showing defense counsel's

incompetent performance. We have considered both the conduct of trial counsel where there was an exception to a ruling, and rulings where no exception was made. Accepting appellate counsel's invitation to keep the competence of trial counsel in mind, we find no error and no lack of professionalism which has prejudiced MacDonald. "The last refuge of the convicted defendant is ... based on claims that counsel was ineffective in handling the case. It is a common claim made both by and against even the best lawyers and usually without success." Hall at § 4.1. MacDonald received effective assistance of counsel.

## III. EVIDENCE AND THE QUANTUM OF PROOF

### A. Irrelevant and Prejudicial Testimony

MacDonald complains that the testimonies of eight witnesses were "prejudicial and not relevant." Four witnesses testified on "Rocky" MacDonald's (defendant's son) consulting business; specifically, on payments, business dealings and discussions with those seeking or doing business with the Navajo Nation regarding the consulting business. Three witnesses described the tribal leasing and contracting process. The last witness described the operations of the chairman's office.

MacDonald specifically argues that testimony regarding his son's business activities had an adverse effect on him. He asks the Court to use the evidentiary prohibition of evidence of "other bad acts" and acts of others to find that the testimony was unfair and prejudicial. Nav. R. Evid. 8(b). The Navajo Nation replies that there was a common scheme between the father and the son, and that evidence of the scheme was permissible under Rule 8(b), which says, "[t]his subdivision does not exclude the evidence when offered for other purposes, such as a proof of motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident."

MacDonald was charged with a conspiracy to violate public corruption laws by using his son to obtain consulting contract fees from those who did business with the Navajo Nation, or wished to do business with the Navajo Nation. The theory was that Rocky was an intermediary who pursued arrangements to cut red tape for leases and contracts, or to obtain favorable action for business deals, using his influence with his father. Two facts are important here. MacDonald was the Chairman of the Navajo Tribal Council, and his son was a law school graduate, with knowledge of government contracts. The theory is-indeed viable.

The test is to weigh the probative value of the evidence against the prejudicial effect the evidence would have on those hearing it. Another goal is to determine whether the evidence would "shed some light on the crime charged." *State v. Featherman*, 133 Ariz. 340, 651 P.2d 868, 872 (1982).

The evidence of the joint dealings of father and son were very illuminating and probative of the conspiracy alleged against them. It was also probative of the matters permitted in Rule 8(b), Navajo Rules of Evidence. The Navajo Nation was entitled to have its theory of a common scheme to violate public corruption

laws heard by the jury. Even if there was an abuse of discretion in permitting the testimony, we cannot see how it had any appreciable effect on the jury. Thus, it would be harmless error. *United States v. Serlin*, 538 F.2d 737, 747 (1976). We see no genuine risk that the emotions of the jury were "excited to irrational behavior," given the other evidence brought out at trial. *United States v. Francesco*, 725 F.2d 817 (1984).

MacDonald cannot complain of the trial court's failure to give a limiting instruction, because he did not request one. The Navajo Nation attributes this failure to trial counsel's defense tactic of recognizing the common scheme theory and focusing upon a lack of direct threats, coercion or retaliation against those who did not pay or hire Rocky as a consultant. That approach was a central part of the defense theory of the case, used on appeal as well, and it was not an unreasonable defense.

## B. Hearsay Testimony

The various legal actions surrounding the trials of MacDonald have made Navajo Nation legal history. The events surrounding his placement on leave from the position of Chairman of the Navajo Tribal Council have prompted legislation, including reforms of the Navajo Nation Government and enactment of a reciprocal code to compel the attendance of witnesses in criminal actions. There has been nationwide litigation over that code, making granting of full faith and credit to tribal laws an important issue. This question arises out of the unique problem of compelling the attendance of witnesses from foreign jurisdictions. We now deal with the issue of using hearsay testimony to relate the knowledge of individuals who could not be brought before the Navajo court.

The hearsay testimonies at issue are those of an F.B.I. agent who testified about her interviews with three officials of the Thriftway Corporation, and the use of a civil deposition transcript of Carl Rowan, an attorney from Washington, D.C. The interviews with Thriftway officials concerned their dealings with MacDonald while seeking to obtain business leases on the Navajo Nation. The deposition recounted MacDonald's contacts with Rowan to solicit money.

The first hurdle in the analysis of this issue is the right of defendants to confront the witnesses against them. This fundamental right is at the core of the American version of the hearsay rule. The test of when hearsay is permissible is as follows:

> [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Ohio v. Roberts*, 448 U.S. 56, 66 (1980).

Rule 27(a)(2) and (5), Navajo Rules of Evidence, points out that a witness is unavailable, and his statement is admissible, when the witness "[p]ersists in refusing to testify concerning the subject matter of his statement despite an order of the judge to do so," or where the witness "[i]s absent from the hearing and [the] proponent of his statement has been unable to procure his attendance by process or other reasonable means." In this case, the Navajo Nation aggressively sought the attendance of witnesses from around the United States, using the Uniform Act to Secure the Attendance of Witnesses, 17 N.T.C. §§ 1970-1973 (1989).

On July 2, 1990, the District of Columbia Superior Court refused to enforce Rowan's Navajo court subpoena under the Act, and the District of Columbia Court of Appeals affirmed the order on August 22, 1990. Rowan was "unavailable" within the meaning of Rule 27(a) (2) and (5). After initially promising the Navajo Nation they would testify, the Thriftway witnesses disappeared, and they could not be located for service of process. They knew the trial was scheduled, and knew they were being sought. The trial court did not abuse its discretion in finding that the Navajo Nation satisfied it burden to show unavailability of the Thriftway witnesses.

The next inquiry is whether the testimony "falls within a firmly rooted hearsay exception." *Roberts*, 448 U.S. at 66. Rule 27(b), Navajo Rules of Evidence, permits admission of four categories of hearsay where the declarant is unavailable as a witness. The third exception - "Statement Against Pecuniary or Proprietary Interest" - is applicable here. The parties have pointed out that while our rules appear to be based upon the Federal Rules of Evidence, they often only mirror the subject headings of those rules. That is correct. The Federal Rules may be used to supplement and give guidance to our rules.

The testimony about the Thriftway officials' statements to the F.B.I. and the United States Attorney's Office (Arizona) was given under circumstances where pecuniary and penal interests were involved. This hearsay exception is based upon the notion that a person will tell the truth if it hurts his pocketbook or tend to subject the speaker to criminal liability. Either ground satisfies the rule. The statements were made to federal officials in a prosecutorial setting, and they were about dealings between a business with extensive leasing arrangements with the Navajo Nation and one of its officials. The Thriftway officials disclosed their arrangements with MacDonald, and the disclosures could lead to adverse action by the lessor, later controlled by officials other than MacDonald. The trial court also accepted, without abusing its discretion, that because falsified documents were involved, that act would "tend" to subject the Thriftway officials to federal criminal liability for making false statements to a federal official. The F.B.I. agent's testimony is admissible under Rule 27(b) (3).

While the agent's testimony was second hand, Rowan's deposition testimony was first hand. Rowan's testimony can be admitted either under Rule 27(b) (3), because of potential violations of attorney ethical standards, or under Rule 26(25) - "Statement Used by a Witness at a Prior Hearing Subject to Cross-

Examination." Rowan's deposition was taken as part of civil action No. CV-89-22209, in the Superior Court for Maricopa County, Arizona. That is a civil damage action against MacDonald.

We adopt the approach in *United States v. McDonald*, 837 F.2d 1287, 1290 (5th Cir. 1988), to consider (1) the nature of the action where the testimony is taken, (2) the strategy or theory of the case in that action, (3) the potential penalties or financial stakes, and (4) the number of issues and parties. We also adopt the approach in *Hertz v. Graham*, 23 F.R.D. 17, 22, 23 (S.D.N.Y. 1958), that where the issues in a prior trial are substantially the same, and where there was an opportunity for the objecting party to cross-examine the witness, a deposition is admissible in the later proceeding.

The Maricopa County civil action was a suit against MacDonald to recoup monies for the Navajo Nation, and Rowan's testimony dealt with MacDonald's solicitation of money from him, when MacDonald was a Navajo Nation official. The civil action arose out of the use of public office for personal gain, to the detriment of the Navajo Nation, and it was designed to assess civil penalties and damages. MacDonald's stake in that action was to prevent paying damages and penalties for his dealings. The issues were substantially the same, and there was an opportunity for MacDonald to cross-examine Rowan during his deposition. The deposition was properly admitted under our rule.

Finally, there is the comparable guarantees of trustworthiness exception under Rule 27(b)(4), Navajo Rules of Evidence. The district court must find that the tendered declaration is comparable to the other exceptions, and that it is trustworthy. Rowan was unavailable as a witness, because the District of Columbia courts refused to honor Navajo Nation process. The testimony in the deposition was Rowan's and not of an interviewer who took notes. It was under oath. The deposition had a connection with the criminal prosecution, because the civil action was one of the tools wielded against MacDonald to deal with his activities in office. The district court did not abuse its discretion under this provision of our rules.

### C. Proof Beyond a Reasonable Doubt

The Navajo Nation must prove each element of each statutory violation charged beyond a reasonable doubt. The defendant's innocence is presumed. 17 N.T.C. § 206; *Platero*, 6 Nav. R. 422, 429 (concurring opinion by Chief Justice Tso). The rules for appellate review of a motion to acquit are set forth in *Platero*.

The issue is whether, in light of all the admissible evidence, the jury's verdicts were clearly correct because there was substantial evidence to support them? First, we examine the elements of each criminal statute MacDonald was alleged to have violated to see what must be proved beyond a reasonable doubt and second, we examine the evidence. The statutes which support the judgments in the record are set forth below.

1. *Bribery in official and political matters*, 17 N.T.C. § 360

MacDonald was charged under Section 360(a) (2), which makes it an offense for a tribal official to (1) solicit, accept, or agree to accept (2) any benefit (3) upon an agreement or understanding (4) that his opinion, judgment, exercise of discretion or other action as a tribal official (5) may be influenced. This is an official misconduct or corruption statute, where transactions showing an agreement between a public official and another are often secretive and hidden. The prosecution may use circumstantial evidence to prove any or all of the elements.

2. *Conspiracy*, 17 N.T.C. § 302

MacDonald was charged under Section 302(a), which defines the offense of conspiracy as (1) the intent (2) to promote or facilitate (3) the commission of an offense (4) by an agreement with one or more persons (5) that at least one of them (6) will engage in conduct constituting an offense, (7) and one of them commits an overt act in furtherance of the agreement. Conspiracy is a broad offense, which covers any conduct by at least two persons to take some action in the commission of an offense. Circumstantial evidence may be used to prove conspiracy.

3. *Ethics Code - gifts and loans*, 2 N.T.C. § 3753

MacDonald was charged in the alternative, under Section 3753(m) (A) or (C). This provision of the Navajo Nation Ethics in Goverment Code generally prohibits (1) public officials from (2) soliciting or accepting for themselves or another (3) any gift (including an economic opportunity, favor, service, or loan; excluding loans from a regular lending institution, on generally available terms) or other benefit worth $100 or more in any calendar year (4) from any person, organization or group which (A1) has, or is seeking to obtain (A2) contractual or other business or financial relationships or approval from any office with which the public official is associated or employed; or (C1) has any interest which (C2) within two years, (C3) has been directly involved with, or affected by, the performance or nonperformance of any official act or duty of the official or the official's office (by association or employment) or (C4) which the public official knows or has reason to believe is likely to be so involved or affected. This complex statute is explained below.

The gist of the prohibited conduct as to those who want to do business with the Navajo Nation is that a public official must not accept anything of the value of $100 or more from them in a given year, if the business wants to get something from the official's office. This is designed to prevent gifts or benefits to officials who may later be in a position to favor the giver. The gist of the prohibition for those who have done business or gotten benefit from the Navajo Nation within the past two years is that a public official may not accept a gift or benefit where the official, or his office dealt with the giver, or the official knows or has reason to know about the involvement. The statute prohibits the practice of businesses who have done business with the Navajo Nation giving a gift or benefit to influence continued favors. There, the Navajo Nation had to prove the identity of

the official, the identity of the giver, and the nature of the gift or benefit.

    4. *Ethics Code - conflict of interests*, 2 N.T.C. § 3753

This charge deals with the prohibition that (1) public officials shall not (A1) have direct or indirect (A2) financial or other economic interest, nor engage in employment or an economic activity which (A3) necessarily involves (A4) inherent substantial conflict, or appears to have a substantial conflict (A5) with official responsibilities or duties. 2 N.T.C. § 3753(d)(1)(A). This statute prohibits any conflict of interest, defined as having a direct or indirect interest in an activity which creates, or appears to create, a substantial conflict with the duties of office. It requires proof of an interest or stake in an activity which conflicts with one's duty to serve the public and not use the public position for personal gain.

    5. *Ethics Code - abstention from official action*, 2 N.T.C. § 3753

Here, MacDonald was charged with separate offenses in the same count. Section 3753(e) (1) (B) requires that (1) when a public official is required to take official action (2) on a matter in which the official has a personal economic interest, (3) the official must first consider eliminating the interest, but if that is not feasible (under another section), (B1) must abstain from sponsoring, influencing or in any manner attempting (B2) to influence any decision or determination (B3) which would favor or advance the official's personal economic interest. Section 3753(e) (1) (C) requires a public official with an interest to (C1) abstain from voting or participating in the decision or determination (C2) unless otherwise directed by the authorized presiding official of the body making the decision or determination (C3) or otherwise required by law, (C4) or unless the official's vote, position, recommendation or participation is contrary to his personal economic interest.

Subsection (e) (1) (B) prohibits a public official who has a financial interest in a proposed deal with the Navajo Nation from influencing or taking part in a decision which would give him economic benefit. Subsection (e) (1) (C) prohibits an official with an economic benefit from participating in a possibly beneficial governmental decision unless a superior directs participation, or it is required by law, or the official takes a stand contrary to his own interest.

Having reviewed the record and the assignments of error regarding specific transactions between MacDonald and various business entities and business people, we find substantial evidence to support the jury's verdict on each count. Some of the statutes recited above are technical in their wording, but the prohibitions they contain are clear. One cannot utiltize public office for private gain. The prosecution theory was simple, and the jury was properly instructed on the elements of the offenses described above.

MacDonald was the Chairman of the Navajo Tribal Council, and his son was a law school graduate. There were various contacts with business people where loans, political contributions, gifts, and consulting contract payments to the MacDonalds were discussed, solicited, or concluded. MacDonald was in a position to extend or withhold benefits to those who wanted Navajo Nation business

or wanted to keep business arrangements with the Navajo Nation. His son was in a position to hold out to people that he could use his lawyer's skills and relationship with his father to promote or keep business. The evidence clearly shows the passage of monies and other benefits to the MacDonalds, and, without doubt, MacDonald was in a position to benefit or hinder business arrangements.

The evidence clearly shows discussions about economic benefits passing to the MacDonalds from those who did business with the Navajo Nation or wanted to do business with the Navajo Nation. The father and son acted together on several of the arrangements. As mentioned, public corruption cases are difficult, because they require circumstantial evidence to prove the elements of the corruption or ethics statute. The jury, as the body which solely determines the facts under the jury system, was in a position to draw proper conclusions and inferences from the evidence to conclude that the public corruption and conspiracy statutes had been violated. We hold, from a review of the record, that there is sufficient evidence to prove each and every element of the statutes charged, beyond a reasonable doubt.

## D. Cumulative Errors

The argument regarding cumulative errors compliments the rule that this Court will cure plain error and grave injustice, but will disregard errors which do not prejudice the defendant and are harmless. The cumulative error doctrine requires reversal of a conviction where the cumulative impact of errors was so prejudicial that the defendant was deprived of a fair trial. *State v. Martin*, 101 N.M. 595, 686 P.2d 937, 943 (1984).

This was no ordinary case. It involved the expenditure of hundreds of thousands of dollars prosecuting and defending a Navajo Nation public figure. The Navajo Nation obtained experienced legal counsel to prosecute, and MacDonald had equally experienced counsel. The case presented on appeal was thorough, and appellate counsel fully developed each relevant issue. Every conceivable question of law affecting fairness of procedure was presented to the trial court, and it properly addressed each. We have found some errors in the trial of this case, but they are harmless. They do not call into question the essential fairness of a given ruling or cause doubt as to the final outcome of the case.

We hold that MacDonald received a fair trial, and the cumulative effect of errors we found is not sufficient to overturn the jury's findings of guilt. The jury's verdict justified the infliction of punishment, so MacDonald is not hurt needlessly. *Platero*, 6 Nav. R. at 424-425.

Navajos greatly respect their leaders, and MacDonald has been exceptional among Navajo leaders because of his achievements, speaking ability, and the respect he gained from those who chose him, followed him, and supported him. A Navajo leader, however, can be relieved of authority if he betrays the people's interests. A leader is judged by his actions, and if he has betrayed the public trust placed in him, punishment follows. Lawyers and witnesses "talked" about

MacDonald in a public place for many days, with people speaking for him and against him. The full story of what he did was made plain and clear, and the six chosen by those who were talking about MacDonald were asked to interpret the story. They found, on behalf of the Navajo people, that public trust and confidence in MacDonald was no longer merited, because he used his leadership position for his own gain and that of his family. Navajo common law criminal procedure was followed.

## IV. CRUEL AND UNUSUAL PUNISHMENT

### A. Double Punishment Through Multiple Charges

This issue was briefly addressed by the parties. MacDonald says that he received separate sentences for eight counts, when they should have been consolidated into four. He says the effect of refusing to consolidate the counts is double punishment, which is prohibited by the double jeopardy provision of the Navajo Nation Bill of Rights, 1 N.T.C. § 5. The prosecution replies that the statute involved in those counts, 17 N.T.C. § 360(a)(2), prohibits the separate acts of soliciting, accepting, or agreeing to accept any benefit, with the understanding that it will influence a tribal official. Counsel dispute whether we should apply a "same evidence" test or a "same transaction" test. Our guide is *Blockburger v. United States*, 284 U.S. 299 (1932): "The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Id.* at 304.

This is a question of statutory construction. We must decide whether the Navajo Nation Council intended to punish separate evils and authorize multiple punishment for official and political bribery when it enacted the Navajo Nation Criminal Code in 1977. The plain language of a criminal statute controls, and any doubt as to the meaning of a penal statute is resolved in defendant's favor. *Platero*, 6 Nav. R. at 429.

The plain meaning of this statute is found on its face. The offense is "bribery in official and political matters," and the two categories of evil the Council addressed were the acts of bribing a public official, and a public official taking a bribe. The subsection MacDonald was charged with violating forbids a tribal official to solicit, accept or agree to accept a benefit, in consideration of that person's official position. The proof required for soliciting, accepting or making an arrangement or agreement to accept is different. We conclude, given the wording of the statute, that the Council intended the law to punish solicitation, acceptance and agreement separately, and to authorize separate or multiple punishments for each.

Shall a chain of events be punished as one act, or does the goal of prohibiting corruption in public office require that each be punished separately? We conclude that the Council intended that a public official should be punished for each

separate act of soliciting a bribe, entering into an arrangement or agreement for a bribe and/or actually accepting the bribe. The trial judge was in the best position to assess the chronology and separateness of the transactions when he rejected the defense motion to merge these counts, and his exercise of discretion will not be disturbed on the basis of the conclusory errors assigned on appeal.

### B. Cruel and Unusual Punishment

The trial judge gave MacDonald consecutive sentences on various counts, while merging others for the purpose of sentencing. The question is whether he abused his discretion in doing so. We previously dismissed the assignment of error regarding jail conditions because they are not ripe for review and there is no factual record to support it. Here, we consider whether consecutive sentences are cruel and unusual punishment. The trial court imposed a sentence of 2,160 days imprisonment, 1,800 days labor, and a fine of $11,000. The sentencing statute provides as follows: "When multiple sentences of imprisonment are imposed on a defendant for more than one crime, such multiple sentences shall run concurrently or consecutively as the court determines at the time of the sentence." 17 N.T.C. § 225 (1977). The words of the statute clearly show that the Council intended to give courts discretionary authority to impose either a concurrent or a consecutive sentence for different offenses.

As a general matter, a criminal sentence is not cruel and unusual punishment as long as it falls within the boundaries set by the legislature. In *Ramos v. Pyramid Tribal Court*, 621 F. Supp. 967 (D. Nev. 1985), the defendant challenged a consecutive sentence imposed by a tribal court as being violative of the Indian Civil Rights Act, 25 U.S.C. § 1302(7). The federal court noted that consecutive sentences for numerous offenses "is a common and frequently exercised power of judges," and rejected the challenge. *Id.* at 970.

We uphold the consecutive sentence imposed in this case. Official corruption in public office is a serious offense, because it robs the Navajo people of their property. Even more seriously, using Navajo culture, it robs the Navajo people of their dignity. We take judicial notice that corruption in public office through bribes, kickbacks, and violations of ethical standards results in poor goods or services, unwise business transactions, losses of public revenue, favoritism to non-Navajos, and a host of other injuries to the public good. Where personal gain sways governmental decisions which should be in the public interest, the benefit to the official almost always causes an injury to the Navajo people. We are not blind to past exploitations of the Navajo people, and the Navajo Nation Council was not blind to them when it enacted both a revised criminal code and an ethics code. The trial judge heard the evidence, and assessed MacDonald's circumstances in sentencing. Nothing in the record persuades this Court that the sentence was arbitrary, not supported by the evidence, or an abuse of discretion.

MacDonald challenges the labor component of his sentence, arguing that "civilized nations no longer impose sentences of hard labor on their citizens." We

take judicial notice that prisoners in confinement in the Navajo Nation jails are not put on rock piles, made to work in chain gangs, or forced to run a treadmill, as has been done in other parts of the United States. Our labor provision comes from the "Law and Order Code" promulgated by the Bureau of Indian Affairs. *See, Matter of Application of Chischilly*, 1 Nav. R. 50, 51 (1972). A sentence of labor usually entails community service within the Navajo Nation.

## V. CONCLUSION

We have examined the record and the arguments of the parties in light of what the law requires. We have approached our task with respect for leadership and the honor due a public figure. We have assessed the law and evidence as judges, and we have reviewed the "talking" about our former leader as Navajos. We have strived to carry out our duties as required by law. The events which have culminated in this decision have tried us all, but the lesson it teaches is, the Navajo Nation will survive as a government of law, nourished by the values, morals, and ideals of equality and sharing which have made Navajo society unique and valuable.

With all due respect, we find that Peter MacDonald Sr. was found guilty by a jury of his peers, under strict standards of fairness and equity that are inherent in the Navajo common law and required by the Navajo Nation Bill of Rights. Accordingly, the judgments and sentences entered on October 22, 1991 are AFFIRMED, and the Window Rock District Court shall execute the sentences which it has imposed.