881 P.2d 1158

**STATE of Arizona, Appellee,**

v.

**Joseph Rudolph WOOD, III, Appellant.**

**No. CR–91–0233–AP.**

Supreme Court of Arizona,
En Banc.

Oct. 11, 1994.

Grant Woods, Atty. Gen., Phoenix, by Paul J. McMurdie, Bruce M. Ferg, and Stephen D. Neely, Pima Co. Atty. by Thomas J. Zawada, Tucson, for State of Arizona.

Pima County Legal Defender by Barry J. Baker Sipe, Tucson, for Joseph Rudolph Wood, III.

## OPINION

FELDMAN, Chief Justice.

A Pima County jury convicted Joseph Rudolph Wood, III ("Defendant") of two counts of first degree murder and two counts of aggravated assault. The trial court sentenced him to death for each murder and to imprisonment for the assaults. Appeal to this court from the death sentences is automatic. Ariz.R.Crim.P. 26.15, 31.2(b). We have jurisdiction under Ariz. Const. art. VI, § 5(3), A.R.S. §§ 13–4031 and 13–4033(A), and Ariz.R.Crim.P. 31.

## FACTS AND PROCEDURAL HISTORY

Defendant shot and killed his estranged girlfriend Debra Dietz ("Debra") and her father Eugene Dietz ("Eugene") on Monday, August 7, 1989, at a Tucson automotive paint and body shop ("the shop") owned and operated by the Dietz family.

Since 1984, Defendant and Debra had maintained a tumultuous relationship increasingly marred by Defendant's abusive and violent behavior. Eugene generally disapproved of this relationship but did not actively interfere. In fact, the Dietz family often included Defendant in dinners and other activities. Several times, however, Eugene refused to let Defendant visit Debra during business hours while she was working at the shop. Defendant disliked Eugene and told him he would "get him back" and that Eugene would "be sorry."

Debra had rented an apartment that she shared with Defendant. Because Defendant was seldom employed, Debra supported him financially. Defendant nevertheless assaulted Debra periodically.[1] She finally tried to end the relationship after a fight during the 1989 July 4th weekend. She left her apartment and moved in with her parents, saying "I don't want any more of this." After Debra left, Defendant ransacked and vandalized the apartment. She obtained an order of protection against Defendant on July 8, 1989. In the following weeks, however, Defendant repeatedly tried to contact Debra at the shop, her parents' home, and her apartment.[2]

Debra and Eugene drove together to work at the shop early on Monday morning, August 7, 1989. Defendant phoned the shop three times that morning. Debra hung up on him once, and Eugene hung up on him twice. Defendant called again and asked another employee if Debra and Eugene were at the shop. The employee said that they had temporarily left but would return soon. Debra and Eugene came back at 8:30 a.m. and began working in different areas of the shop. Six other employees were also present that morning.

At 8:50 a.m., a Tucson Police officer saw Defendant driving in a suspicious manner near the shop. The officer slowed her patrol car and made eye contact with Defendant as he left his truck and entered the shop. Eugene was on the telephone in an area where three other employees were working. Defendant waited for Eugene to hang up, drew a revolver, and approached to within four feet of him. The other employees shouted for Defendant to put the gun away. Without saying a word, Defendant fatally shot Eugene once in the chest and then smiled. When the police officer saw this from her patrol car she immediately called for more officers. Defendant left the shop, but quickly returned and again pointed his revolver at

1. Debra was often bruised and sometimes wore sunglasses to hide blackened eyes. A neighbor who often heard "thuds and banging" within Debra's apartment called police on June 30, 1989, after finding Debra outside and "hysterical." The responding officer saw cuts and bruises on Debra.

2. Defendant left ten messages on Debra's apartment answering machine on the night of Friday, August 4, 1989. Some contained threats of harm, such as: "Debbie, I'm sorry I have to do this. I hope someday somebody will understand when we're not around no more. I do love you babe. I'm going to take you with me."

the now supine Eugene. Donald Dietz, an employee and Eugene's seventy-year-old brother, struggled with Defendant, who then ran to the area where Debra had been working.

Debra had apparently heard an employee shout that her father had been shot and was trying to telephone for help when Defendant grabbed her around the neck from behind and placed his revolver directly against her chest. Debra struggled and screamed, "No, Joe, don't!" Another employee heard Defendant say, "I told you I was going to do it, I have to kill you." Defendant then called Debra a "bitch" and shot her twice in the chest.

Several police officers were already on the scene when Defendant left the shop after shooting Debra. Two officers ordered him to put his hands up. Defendant complied and dropped his weapon, but then grabbed it and began raising it toward the officers. After again ordering Defendant to raise his hands, the officers shot Defendant several times.

A grand jury indicted Defendant on two counts of first degree murder and two counts of aggravated assault against the officers. Although he did not testify, Defendant did not dispute his role in the killings but argued he had acted impulsively and without premeditation. A jury found Defendant guilty on all counts. The trial court sentenced him to death for each of the murders and to concurrent fifteen-year prison terms for the aggravated assaults, to be served consecutively to the death sentences. This appeal followed.

## DISCUSSION

### A. TRIAL ISSUES

■ Defendant makes many ineffective assistance of counsel claims. Such claims generally should be pursued in post-conviction relief proceedings pursuant to Ariz.R.Crim.P. 32. Because they are fact-intensive and of-

ten involve matters of trial tactics and strategy, trial courts are far better-situated to address these issues. *State v. Valdez*, 160 Ariz. 9, 14–15, 770 P.2d 313, 318–19 (1989). We decline to address them here and turn instead to the other issues presented.

### 1. *Admission of alleged "other act," hearsay, and irrelevant testimony*

■ Defendant alleges that the trial court improperly admitted testimony from various witnesses, violating his confrontation and due process rights. Unfortunately, appellate counsel has failed to articulate separate grounds of objection to each portion of testimony.[3] We will, therefore, separate and address the challenged testimony in seven categories. Because the trial court is in the best position to judge the admissibility of proffered testimony, we review most evidentiary claims on a discretionary standard. *See, e.g., State v. Prince*, 160 Ariz. 268, 274, 772 P.2d 1121, 1127 (1989); *State v. Chapple*, 135 Ariz. 281, 297 n. 18, 660 P.2d 1208, 1224 n. 18 (1983).

#### a. *Character evidence and prior acts*

■ The trial court denied Defendant's motion to suppress evidence of his prior bad acts. Defendant alleges that the trial court improperly admitted testimony concerning his alleged violent acts against Debra in violation of Ariz.R.Evid. 404(a). We disagree.

■ Rule 404(a) generally precludes admission of other acts to prove a defendant's character or "to show action in conformity therewith" on a particular occasion. *State v. Bible*, 175 Ariz. 549, 575, 858 P.2d 1152, 1178, *cert. denied*, —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1993). Evidence of certain types of prior acts is admissible, however, "for other purposes such as proof of motive,

---

3. Defense counsel reproduced 20 excerpts of trial testimony amounting to 14 pages in his opening brief and then made a generic claim that all the testimony was improperly admitted on hearsay, relevance, opinion testimony, or Rule 404 grounds. To say the least, this is an unhelpful appellate practice. On appeal, counsel must

clearly identify the objectionable portions of testimony and the specific basis for each claimed error. *See* Ariz.R.Crim.P. 31.13(c)(1)(iv). Because this is a capital case and we must search for fundamental error, we will examine the evidentiary claims before considering the question of any waiver by appellate counsel.

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ariz.R.Evid. 404(b). This list of permissible purposes is merely illustrative, not exclusive. *State v. Jeffers*, 135 Ariz. 404, 417, 661 P.2d 1105, 1118 (1983), *cert. denied*, 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983), *rev'd on other grounds, Jeffers v. Ricketts*, 832 F.2d 476, 480–81 (9th Cir.1987); Morris K. Udall et al., ARIZONA PRACTICE-LAW OF EVIDENCE § 84, at 179 n. 6 (3d ed. 1991).

■ This court has "long held that where the existence of premeditation is in issue, evidence of previous quarrels or difficulties between the accused and the victim is admissible." *Jeffers*, 135 Ariz. at 418, 661 P.2d at 1119 (citing *Leonard v. State*, 17 Ariz. 293, 151 P. 947 (1915)). Such evidence "tends to show the malice, *motive* or *premeditation* of the accused." *Id.* at 418, 661 P.2d at 1119 (emphasis added). In some cases, of course, such evidence may also show lack of premeditation. In either event, it is relevant. Defendant's abuse of Debra falls squarely within this rule and, under the facts of this case, tends to show both motive and premeditation.

■ Premeditation was the main trial issue. The defense was lack of motive to kill either victim and the act's alleged impulsiveness, which supposedly precluded the premeditation required for first degree murder. *See* A.R.S. § 13–1105(A)(1). Defendant's prior physical abuse of and threats against Debra were relevant to show his state of mind and thus were properly admitted under Rule 404(b). *See State v. Featherman*, 133 Ariz. 340, 344–45, 651 P.2d 868, 872–73 (Ct.App. 1982) (evidence of prior assault on victim admissible to show defendant's intent in murder prosecution).

#### b. *Hearsay statements of Debra Dietz*

■ A number of witnesses testified to statements made by Debra about her fear of Defendant and her desire to end their relationship. Defendant claims the trial court erred in admitting this testimony over a continuing objection that the statements were irrelevant and hearsay.[4] We address each contention.

Evidence is relevant "if it has any basis in reason to prove a material fact in issue or if it tends to cast light on the crime charged." *State v. Moss*, 119 Ariz. 4, 5, 579 P.2d 42, 43 (1978); Ariz.R.Evid. 401. We have found similar testimony relevant in analogous cases. For instance, in *State v. Fulminante*, evidence of the victim's fear of the defendant and their acrimonious relationship was relevant to the defendant's motive and admissible to refute defense claims that the relationship was harmonious. 161 Ariz. 237, 251, 778 P.2d 602, 616 (1989), *aff'd*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).[5] Contrary to Defendant's assertion, *State v. Charo*, 156 Ariz. 561, 754 P.2d 288 (1988), and *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (1981), are consistent with this general rule. Those cases hold merely that evidence of the victim's fear of the defendant is not relevant to prove the defendant's conduct or identity. *Charo*, 156 Ariz. at 564–65, 754 P.2d at 291–92; *Christensen*, 129 Ariz. at 36, 628 P.2d at 584. In the present case, by contrast, Defendant's conduct and identity were undisputed.

■ The statements about Debra's fear and desire to end the relationship helped explain Defendant's motive. The disputed trial issues were Defendant's *motive* and *mental state*—whether Defendant acted with premeditation or as a result of a sudden impulse. The prosecution theorized that Defendant was motivated by anger or spite engendered by Debra's termination of the

---

4. The trial court denied Defendant's pretrial motion to suppress all hearsay testimony relating to statements by Debra and recorded defense counsel's continuing objection to such testimony. This is a proper method of preserving error for appeal. *State v. Christensen*, 129 Ariz. 32, 36, 628 P.2d 580, 584 (1981).

5. Other jurisdictions follow this approach. *See, e.g., United States v. Donley*, 878 F.2d 735, 738 (3d Cir.1989) (victim's statements regarding plan to end relationship relevant to defendant's mental state in murder prosecution), *cert. denied*, 494 U.S. 1058, 110 S.Ct. 1528, 108 L.Ed.2d 767 (1990); *State v. Payne*, 327 N.C. 194, 394 S.E.2d

relationship.[6] Debra's statements were relevant because they showed her intent to end the relationship, which in turn provided a plausible motive for premeditated murder. *See Fulminante,* 161 Ariz. at 251, 778 P.2d at 616. In addition, Debra's statements were also relevant to refute Defendant's assertion that he and Debra had secretly maintained their relationship after July 4, 1989. *Id.*

Defendant contends that even if the statements were relevant, they were still inadmissible hearsay. Although hearsay, these statements fall within a well-established exception allowing admission of hearsay statements concerning the declarant's then-existing state of mind, emotion, or intent, if the statements are not offered to prove the fact remembered or believed by the declarant. Ariz.R.Evid. 803(3).

Debra's statements were not offered to prove any fact. Instead, they related solely to her state of mind when the statements were made and thus fit within the Rule 803(3) exception. *Fulminante,* 161 Ariz. at 251, 778 P.2d at 616 (victim's desire to move from defendant's home properly admitted under Rule 803(3)). The trial court did not err in admitting this testimony.

### c. The neighbor's testimony

The following exchange occurred during the state's direct examination of a neighbor who lived next to the apartment shared by Defendant and Debra:

Q. Did she [Debra] ever have another conversation with you later on when she related the same information to you?

A. Yes, she did. I remember that instance very clearly ... *she told me that she did not want to stay at the apartment because Joe had threatened her life.*[7]

Neither Defendant nor the state addressed why this particular testimony may have been offered, either at trial or on ap-

peal. The statement that Defendant had threatened Debra does not reflect Debra's state of mind but rather appears to be a statement of "memory or belief to prove the fact remembered or believed." Ariz.R.Evid. 803(3). This declaration therefore falls outside the state of mind exception and should not have been admitted. *Charo,* 156 Ariz. at 563–64, 754 P.2d at 190–91; *Christensen,* 129 Ariz. at 36, 628 P.2d at 584. Defendant preserved this claim by his continuing objection at trial, so we must consider the effect of its admission.

We review a trial court's erroneous admission of testimony under a harmless error standard. *Bible,* 175 Ariz. at 588, 858 P.2d at 1191. Unless an error amounts to a structural defect, it is harmless if we can say "beyond a reasonable doubt that the error had no influence on the jury's judgment." *Id.; see also Sullivan v. Louisiana,* —— U.S. ——, ——, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) (error is only harmless if guilty verdict "was surely unattributable to the error"). We consider particular errors in light of the totality of the trial evidence. *State v. White,* 168 Ariz. 500, 508, 815 P.2d 869, 877 (1991), *cert. denied,* 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992). An error that requires reversal in one case may be harmless in another due to the fact-specific nature of the inquiry. *Bible,* 175 Ariz. at 588, 858 P.2d at 1191.

Premeditation was the key trial issue, and we recognize that a prior threat is relevant to that issue. Premeditation requires proof that the defendant "made a decision to kill prior to the act of killing." *State v. Kreps,* 146 Ariz. 446, 449, 706 P.2d 1213, 1216 (1985). The interval, however, can be short. *Id.* Either direct or circumstantial evidence may prove premeditation. *State v. Hunter,* 136 Ariz. 45, 48, 664 P.2d 195, 198 (1983).

---

158, 165, *cert. denied,* 498 U.S. 1092, 111 S.Ct. 977, 112 L.Ed.2d 1062 (1990).

**6.** Immediately after the murders, Defendant repeatedly said that "if he and Debra couldn't be together in life, they would be together in death."

**7.** Reporter's Transcript ("R.T."), Feb. 20, 1991, at 46–47 (emphasis added).

▆▆ Initially, we note that a tendency to act impulsively in no way precludes a finding of legal premeditation. Defendant offered little evidence to support his claim that he acted without premeditation on the morning of the murders. A defense expert briefly testified that Defendant displayed no signs of organic brain damage or psychotic thinking. The essence of his testimony militating against premeditation was that Defendant "appeared to be an individual that would act in an impulsive fashion, responding more to emotions rather than thinking things out." This expert, however, examined Defendant for a total of six hours more than thirteen months after the murders, and there was no testimony correlating this trait to Defendant's conduct on August 7, 1989. Other witnesses testified that Defendant had, at various times, acted violently for no apparent reason. These instances usually occurred, however, when Defendant had been abusing alcohol or drugs. There was no evidence that Defendant consumed alcohol or drugs before the murders.

There was, on the other hand, a great deal of evidence that unequivocally compels the conclusion that Defendant acted with premeditation. *See Bible,* 175 Ariz. at 588, 858 P.2d at 1191. Defendant disliked and had threatened Eugene. Three days before the killing, Defendant left threatening phone messages with Debra showing his intent to harm her.[8] Defendant called the shop just before the killings and asked whether Debra and Eugene were there. Although Defendant regularly carried a gun, on the morning of the murders he also had a spare cartridge belt with him, contrary to his normal practice. Defendant calmly waited for Eugene to hang up the telephone before shooting him. There was no evidence that Eugene did or said anything to which Defendant might have impulsively responded. Finally, Defendant looked for Debra after shooting Eugene, found her in a separate area, and held her before shooting her, stating, "I told you I was going to do it, I have to kill you."

▆▆ The hearsay statement about threats came from the state's first witness on the first day of a five-day trial. The prosecutor

neither emphasized it nor asked the witness to elaborate. Nor did the prosecutor mention the statement in closing argument. *Cf. Charo,* 156 Ariz. at 563, 754 P.2d at 190 (noting prosecution's emphasis of improperly-admitted evidence during closing argument in finding reversible error). We note, also, that other statements, properly admitted, established that Defendant had threatened Debra on other occasions. We stress that this court cannot and does not determine an error is harmless merely because the record contains sufficient untainted evidence. *Bible,* 175 Ariz. at 590, 858 P.2d at 1193. Given this record, however, we are convinced beyond a reasonable doubt that the statement did not influence the finding of premeditation implicit in the verdict. *See State v. Coey,* 82 Ariz. 133, 142, 309 P.2d 260, 269 (1957) (finding no reversible error in admission of hearsay statement bearing on pre-meditation). The error was harmless.

**d. Constitutional claims**

▆▆ Defendant urges that admission of this and other hearsay statements violated his right to confront witnesses in contravention of the Sixth and Fourteenth Amendments. The state claims that Defendant failed to properly raise this claim in either this or the trial court. We need not reach these issues, however, because of our disposition of Defendant's hearsay claims. There is no Confrontation Clause violation when the hearsay testimony of a deceased declarant is admitted pursuant to a firmly-rooted hearsay exception. *White v. Illinois,* 502 U.S. 346, 356, 112 S.Ct. 736, 743, 116 L.Ed.2d 848 (1992); *Bible,* 175 Ariz. at 596, 858 P.2d at 1199. The Rule 803(3) state of mind exception is such a recognized exception. *See, e.g., Lenza v. Wyrick,* 665 F.2d 804, 811 (8th Cir.1981). Additionally, as in this case, a Confrontation Clause violation can be harmless error. *Harrington v. California,* 395 U.S. 250, 253, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); *State v. Wilhite,* 160 Ariz. 228, 233, 772 P.2d 582, 587 (Ct.App.1989).

**e. Hearsay statements of Eugene Dietz**

▆▆ Defendant alleges next that several witnesses improperly testified about hearsay

8. *See supra,* note 2.

statements made by Eugene Dietz. To the extent these statements concerned Eugene's state of mind about the animosity between him and Defendant, the statements, like Debra's, were relevant and properly admitted under Rule 803(3). *See Fulminante,* 161 Ariz. at 251, 778 P.2d at 616.

One witness testified, however, that Eugene said, "Nobody is going to stop [Defendant] until he kills somebody." This does not fall within the Rule 803(3) state of mind exception because it is a statement of belief to prove the fact believed. *Christensen,* 129 Ariz. at 36, 628 P.2d at 584. Defendant did not object to this testimony, however, nor was it the subject of any pretrial motion. This claim thus is waived unless it rises to the level of fundamental error. *State v. West,* 176 Ariz. 432, 445, 862 P.2d 192, 205 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994). Error is only fundamental if it goes to the essence of a case, denies the defendant a right essential to a defense, or is of such magnitude that the defendant could not have received a fair trial. *State v. Cornell,* 179 Ariz. 314, 329, 878 P.2d 1352, 1367 (1994).

The "essence" of this case was Defendant's mental state at the time of the murders. Eugene's statement of belief does not clearly establish premeditation nor refute Defendant's defense of impulsivity. Given the clear quantum of evidence supporting premeditation, admission of this lone statement did not deprive Defendant of a fair trial. *See id.* at 51. We conclude that admission of Eugene's hearsay statement does not meet the "stringent standard" of fundamental error. *Bible,* 175 Ariz. at 573, 858 P.2d at 1176.

### f. *Defendant's statements*

Defendant next claims that his own statements were hearsay and improperly admitted. This claim is meritless. A defendant's out-of-court statements are not hearsay when offered by the state. Ariz.R.Evid. 801(d)(2)(A); *State v. Atwood,* 171 Ariz. 576, 635, 832 P.2d 593, 652 (1992).

### g. *Other evidentiary claims*

On appeal, Defendant objects for the first time to the admission of testimony revealing that Defendant had been fired from two jobs, once for fighting with a co-worker and once due to his "temperament." Because these claims were not raised below, we review only for fundamental error. *West,* 176 Ariz. at 445, 862 P.2d at 205. Arguably, this testimony concerns prior bad acts inadmissible under Rule 404. The state claims Defendant made a tactical decision not to object to the testimony because it tended to show Defendant's impulsivity. We decline to resolve the issue, however, because even if the testimony was erroneously admitted, its admission does not rise to the level of fundamental error. The testimony in both instances was perfunctory and undetailed. Moreover, there was other compelling evidence of Defendant's ill temper, much of it introduced by Defendant himself on the issue of impulsivity.

Defendant's final evidentiary claim concerns testimony of a witness who related a neighbor's report that Defendant had vandalized Debra's apartment. This testimony was hearsay and should not have been admitted. *See* Ariz.R.Evid. 801 and 802. Again, Defendant did not object to this testimony. Because other witnesses presented direct testimony on the same issue, we conclude Defendant was not prejudiced. *See Fulminante,* 161 Ariz. at 250, 778 P.2d at 615. We find no fundamental error.

### 2. *Failure to instruct on manslaughter*

The trial court instructed the jury on both first and second degree murder under A.R.S. §§ 13–1105(A)(1) and 13–1104. Defendant claims the trial court committed reversible error by failing to *sua sponte* instruct the jury on the lesser-included offense of manslaughter. We disagree. It is true that in capital cases, trial courts must instruct on all lesser-included homicide offenses supported by the evidence. *State v. Comer,* 165 Ariz. 413, 422, 799 P.2d 333, 342 (1990), *cert. denied,* 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 460 (1991). It is equally true, however, that such instructions need not be given if unsupported by the evidence.

*State v. Clabourne,* 142 Ariz. 335, 345, 690 P.2d 54, 64 (1984).

The manslaughter statute provides, in relevant part:

A. A person commits manslaughter by:

1. Recklessly causing the death of another person; or

2. Committing second degree murder ... upon a sudden quarrel or heat of passion resulting from adequate provocation by the victim; or

3. Committing second degree murder ... while being coerced to do so by the use or threatened *immediate* use of unlawful deadly physical force ...

A.R.S. § 13–1103(A). There was no evidence to support a manslaughter instruction. These were not reckless shootings. Nor was there evidence Defendant was provoked or coerced. Defendant intentionally shot both victims at close range. The claim is meritless. *See State v. Ortiz,* 158 Ariz. 528, 534, 764 P.2d 13, 19 (1988).

### 3. *Sufficiency of evidence of aggravated assault*

■■■■ The trial court denied Defendant's motion for directed verdicts on the aggravated assault counts. Defendant now alleges those convictions are not supported by sufficient evidence because neither police officer testified to a subjective fear of imminent physical harm. We have previously rejected this same argument. *Valdez,* 160 Ariz. at 11, 770 P.2d at 315. To be guilty of aggravated assault, "the defendant need only intentionally act using a deadly weapon or dangerous instrument so that the victim is placed in reasonable apprehension of imminent physical injury." *Id.* Either direct or circumstantial evidence may prove the victim's apprehension. There is no requirement that the victim testify to actual fright. *Id.*

There was ample circumstantial evidence supporting the conclusion that the officers were apprehensive or in fear of imminent harm. The police officers knew that at least one victim had been shot and that other shots had been fired. Defendant grabbed his revolver and began to aim at the officers despite their orders not to do so. Police officers, of course, are not immune from the fear that anyone would reasonably feel under these circumstances. *See In re Juvenile Appeal No. J–78539–2,* 143 Ariz. 254, 256, 693 P.2d 909, 911 (1984) (sufficient evidence of apprehension where police officer-victim drew gun and assumed protective stance). The jury could have concluded the officers must have acted with apprehension or fear when they used deadly force against Defendant. The evidence certainly supports that conclusion.

### 4. *Prosecutorial misconduct*

■■■■ Defendant alleges the prosecutor "ran amok" at trial, particularly in his cross-examination of Dr. Allender, Defendant's psychological expert.[9] Because defense counsel made no trial objection, again we review these claims only for fundamental error. *Bible,* 175 Ariz. at 601, 858 P.2d at 1204. In determining whether a prosecutor's conduct amounts to fundamental error, we focus on the probability it influenced the jury and whether the conduct denied the defendant a fair trial. *See id.*

■■■■ Subject to Rule 403 limitations, expert witnesses may disclose facts not otherwise admissible if they form a basis for their opinions and are of a type normally relied on by experts. Ariz.R.Evid. 703; *State v. Lundstrom,* 161 Ariz. 141, 145, 776 P.2d 1067, 1071 (1989). If such facts are disclosed, they are admissible only to demonstrate the basis for the expert's testimony. *Lundstrom,* 161 Ariz. at 146, 776 P.2d at 1071. However, to offset the potential advantage this rule bestows on the proponent of expert opinion, "it is proper to inquire into the reasons for [the] opinion, including the facts upon which it is based, and to subject the expert to a most *rigid cross-examination* concerning his opinion and its sources." *State v. Stabler,* 162 Ariz. 370, 374, 783 P.2d

---

9. Defendant styles several additional alleged instances of prosecutorial misconduct as ineffective assistance of counsel claims, based on his defense counsel's failure to object. As previously noted, these claims are better left to Rule 32 proceedings. *See Valdez,* 160 Ariz. at 14–15, 770 P.2d at 318–19. We do not address them.

816, 820 (Ct.App.1989); Ariz.R.Evid. 705. This latitude on cross-examination extends to matters otherwise inadmissible. *United States v. A & S Council Oil Co.,* 947 F.2d 1128, 1135 (4th Cir.1991) ("Rule 703 creates a shield by which a party may enjoy the benefit of inadmissible evidence by wrapping it in an expert's opinion; Rule 705 is the cross-examiner's sword, and, within very broad limits, he may wield it as he likes.").

 With these principles in mind, we turn to the alleged misconduct. On direct examination, defense counsel asked Dr. Allender what materials he reviewed in preparing to examine Defendant. Dr. Allender replied, in part, "a variety of police reports from the Tucson Police Department, as well as from the Las Vegas Police Department." On cross-examination, the following exchange occurred:

Q. Directing your attention, you said you had some Las Vegas police reports?

A. Yes.

Q. You had police reports from 1979?

A. I believe I did. I would have to flip through and look for it if you want me to.

Q. Do you recall in 1979 an incident when he was arrested from some criminal activity?

A. I think I found a report from '79 from Las Vegas.

R.T., Feb. 22, 1991, at 160–61. Defendant alleges this was improper because the trial court had ruled inadmissible Defendant's 1979 Las Vegas misdemeanor assault conviction. On cross-examination, however, the prosecutor simply asked Dr. Allender to elaborate on the reports he first mentioned on direct examination. The jury never learned the details of the conduct underlying Defendant's Las Vegas arrest. Because Dr. Allender relied on the reports in forming his opinion of Defendant, the prosecutor's cross-examination was proper.

 Defendant was entitled, however, to a limiting instruction that references to the Las Vegas police reports were admissible only to show the basis of Dr. Allender's opinions. *See Lundstrom,* 161 Ariz. at 148, 776 P.2d at 1074. Defense counsel did not

request such an instruction. On this record, we conclude that the absence of such an instruction did not deprive Defendant of a fair trial. There was no fundamental error.

 Defendant also argues that the prosecutor improperly cross-examined Dr. Allender about the possibility of testing Defendant to determine the validity of his claim that he had no memory of the day of the murders. The full extent of that questioning was as follows:

Q. Didn't Dr. Morris [another psychologist who examined Defendant] suggest that hypnosis or amobarbital might be ideal to discover whether this defendant was malingering?

A. He suggested that those might be techniques.

Q. With hypnosis, you place them under hypnosis in order to find out what the truth of the matter was?

A. [Answer about the theory of hypnosis and amobarbital.]

Q. So you didn't, did you attempt, did you request a hypnosis evaluation?

A. I didn't because I'm not as convinced about those techniques as Dr. Morris.

Q. Amobarbital, is that a truth serum?

A. That is what they call it, that is what people have called it along the way.

R.T., Feb. 22, 1991, at 173–74.

 Defendant claims this exchange prejudiced him much like questioning a defendant about refusing to take a polygraph test. It is true that, as with polygraph test results, courts generally exclude testimony induced or "refreshed" by drugs or hypnosis. *Jeffers,* 135 Ariz. at 431, 661 P.2d at 1132; *State v. Mena,* 128 Ariz. 226, 228–29, 624 P.2d 1274, 1276–77 (1981). Defendant's analogy, however, is misguided. The prosecutor's cross-examination was not intended to impugn Defendant but to test the basis and credibility of Dr. Allender's opinions concerning whether Defendant was faking his asserted memory loss at the time of the murders. Dr. Morris had examined Defendant and recommended the disputed testing. Dr. Allender relied in part on Dr. Morris's written evaluation in forming his own opinions about

Defendant. Without reaching the issue of admissibility of expert testimony based upon the results of hypnotic or amobarbital examination of a subject, we conclude the prosecutor acted within the wide latitude permitted on cross-examination. *Stabler*, 162 Ariz. at 374, 783 P.2d at 820.

### 5. The Wussler *instruction*

■ Defendant next claims the trial court violated his due process rights by instructing the jury that it must acquit Defendant of the principle charge before considering any lesser included offenses. Although we have previously rejected a similar claim, *see State v. Wussler*, 139 Ariz. 428, 429–30, 679 P.2d 74, 75–76 (1984), we need not address it here.[10] The record reveals that the trial court *refused* the state's request to give such an instruction. Rather, the trial court instructed the jury that if it determined Defendant was guilty of either first or second degree murder, but had a reasonable doubt as to which one, it must find him guilty of second degree murder. That instruction was not improper.

### 6. *Alleged plea bargain veto by victims' family*

■ On appeal, Defendant urges for the first time that his due process and equal protection rights were violated when the victims' family allegedly "vetoed" a plea bargain in which the state would not seek the death penalty in exchange for a guilty plea to all counts. Defendant attacks the family's involvement in both the plea bargaining process and the decision to seek the death penalty. Defendant rests his claim on the following passage from his trial counsel's opposition to a motion to continue, which the state filed at the request of the victims' family:[11]

In this case, the family has already put the quietus on any plea negotiations. Undersigned counsel and the prosecutor had earlier discussions about the defendant enter-

ing into a guilty plea to two counts of First Degree Murder, with two life sentences.... Upon conferring with the Dietz family, the prosecutor announced he could not make such an offer. Clearly the County Attorney has permitted the family to put the finishing stroke to a fair and economical end to this case.

Opposition to Motion to Continue Trial, filed Nov. 19, 1990, at 2.

■ The state properly may consider the wishes of the victim's family in deciding whether to seek the death penalty, so long as it does not accord undue weight to those wishes. *State v. Lavers*, 168 Ariz. 376, 397, 814 P.2d 333, 354 (1991), *cert. denied*, 502 U.S. 926, 112 S.Ct. 343, 116 L.Ed.2d 282 (1991). Moreover, Arizona crime victims have a constitutional and procedural *right* to confer with the state on any prospective plea bargain. *See* Ariz. Const. art. II, § 2.1(A)(4); Ariz.R.Crim.P. 39(b)(7). In the present case we need not consider the breadth of that right because the record does not support Defendant's contention that the family's wishes were the controlling factor in the state's decision to forego a plea and pursue the death penalty. Other than the passage quoted above, the record is silent on plea negotiations and the state's decision to seek death. Since that passage appears to be little more than defense counsel's rhetorical comment, and there is no evidence in the present record that the state gave any undue consideration to the desires of the victims' family, we find no error. *See Lavers*, 168 Ariz. at 397–98, 814 P.2d at 354–55.

### B. SENTENCING ISSUES

■ In all capital cases we independently review the aggravating and mitigating circumstances to determine whether the former outweigh the latter and warrant imposition of the death penalty. *State v. Johnson*, 147 Ariz. 395, 400, 710 P.2d 1050, 1055 (1985).

---

10. We presently have before us a case raising the so-called *Wussler* issue. *See State v. Cañez*, Ariz. Sup.Ct. No. CR–93–0161–PR.

11. At one time, Defendant's trial was set for December 12, 1991. The victims' family asked the state to seek a continuance until after the holiday season because they feared jurors might

be "more concerned with the fast approaching Christmas Holiday." The family communicated these concerns to the trial court in a letter. The court denied the state's motion. Subsequently, the trial court continued the trial at the parties' mutual request due to scheduling conflicts.

Our duty is to ensure that Arizona's capital sentencing scheme "genuinely narrow[s] the class of persons eligible for the death penalty." *Arave v. Creech,* — U.S. —, —, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993).

### 1. *Aggravating circumstances*

 Following an aggravation-mitigation hearing, the trial court entered a special verdict pursuant to A.R.S. § 13-703(D). The trial court found two aggravating circumstances beyond a reasonable doubt: (1) Defendant was convicted of one or more other homicides, as defined in A.R.S. § 13-1101, which were committed during the commission of each offense; and (2) in the commission of the offenses Defendant knowingly created a grave risk of death to another person or persons in addition to the victims of the offenses. *See* A.R.S. §§ 13-703(F)(8) and (F)(3).

There is no question about the first aggravating circumstance. Defendant does not challenge the trial court's finding that he was convicted of another homicide during the commission of each offense. This was a double murder. The trial court properly found the A.R.S. § 13-703(F)(8) aggravating circumstance. *See Lavers,* 168 Ariz. at 393, 814 P.2d at 350.

 The trial court also found beyond a reasonable doubt that in the commission of the murders, Defendant knowingly created a grave risk of death to another person in addition to the victims. *See* A.R.S. § 13-703(F)(3). Defendant urges that this finding was erroneous because he did not actually shoot at any person other than the victims and because no bystanders were within his "line of fire." Although there is merit to Defendant's arguments, we reject such a narrow reading of this aggravating circumstance under the unusual facts of this case.

 The "grave risk of death to another" factor applies only if the defendant's "murderous act itself put other people in a zone of danger." *See, e.g., State v. McCall,* 139 Ariz. 147, 160-61, 677 P.2d 920, 933-34

(1983) (citing cases), *cert. denied,* 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984). We have never, however, limited this factor to cases in which another person was directly in the line of fire. For example, we have found a zone of danger where the defendant shot his intended victim while a third person was nearby and then pointed his gun at the third person before returning his attention to the victim. *State v. Nash,* 143 Ariz. 392, 405, 694 P.2d 222, 235, *cert. denied,* 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985). We noted there that in the absence of such a combination of factors—the third person's proximity during the actual shooting and the defendant's pointing his gun—the general rule is that mere presence of bystanders or pointing a gun at another to facilitate escape does not bring a murderous act within A.R.S. § 13-703(F)(3). *Id.* at 405, 684 P.2d at 235 (citing *Jeffers,* 135 Ariz. at 429, 661 P.2d at 1130 (pointing gun to quiet third person)); *see also State v. Smith,* 146 Ariz. 491, 503, 707 P.2d 289, 301 (1985) (risk to others factor could not be found merely because defendant took weapon into crowded public place where bystander could be hurt). No single factor is dispositive of this circumstance. Our inquiry is whether, during the course of the killing, the defendant knowingly engaged in conduct that created a real and substantial likelihood that a specific third person might suffer fatal injury.

 In this case, several factors *in combination* support the conclusion that Defendant knowingly created a grave risk of death to others.[12] First, at least three other employees were present in the confined garage where Defendant shot Eugene. *See State v. McMurtrey,* 151 Ariz. 105, 108, 726 P.2d 202, 205, *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 530 (1987) (presence of others in immediate area supports grave risk circumstance). One was standing only six to eight feet away from Eugene at the time of the shooting. *See Nash,* 143 Ariz. at 404-05, 694 P.2d at 234-35. After Defendant shot Eugene, he turned toward another employee as if "he was going to shoot but [that employ-

---

12. In its special verdict, the trial court failed to specify which of the several persons present at the murder scene Defendant placed at grave risk of death. We thus review the record to determine whether the factor applies beyond a reasonable doubt to any of those persons.

ee] ... really got out of there fast."[13] *See id.* at 405, 694 P.2d at 235 (defendant's aiming at bystander, who dived under desk to escape injury, supports factor). When Defendant pointed his gun at Eugene again, one employee fought with Defendant and even grabbed the gun's barrel. Moreover, a firearms expert testified that the position of the fired and unfired cartridges in the murder weapon showed that Defendant had cocked and uncocked the gun twice between shooting Eugene and Debra. Thus, there is evidence Defendant knowingly prepared the gun to fire both when he assumed a shooting stance toward one employee and when he grappled with the other. All this occurred during Defendant's commission of the two murders. Without retreating from *Nash* and *Smith*, we believe that under these circumstances the judge's finding that Defendant created a grave risk of death to at least these two employees is correct.[14]

### 2. *Mitigating factors*

 In capital sentencing proceedings, the trial court must consider the mitigating factors in A.R.S. § 13–703(G) as well as any aspect of the defendant's background or the offense relevant to determining whether the death penalty is appropriate. *Bible,* 175 Ariz. at 605, 858 P.2d at 1208. Defendant must establish mitigating factors by a preponderance of the evidence. *Id.* We independently examine the record for mitigating evidence to determine whether the death sentence is justified. *State v. Fierro,* 166 Ariz. 539, 551, 804 P.2d 72, 84 (1991).

In its special verdict, the trial court stated it found the following mitigating factors:

Lack of any prior felony convictions and any other mitigating circumstances set forth in the presentence report, including all testimony presented by the psychiatrist ... [in] mitigations [sic] of sentence. Including the chemical substance abuse problems which you have suffered from, the

Court finds that ... [the] mitigating circumstances are not sufficiently mitigating to outweigh the aggravating factors found by this Court beyond a reasonable doubt.

R.T., July 12, 1991, at 32. Defendant argues that the trial court erroneously failed to find several statutory mitigating circumstances. We address each claim in turn.

 Defendant urges that the trial court erred in not finding his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13–703(G)(1). This factor is phrased disjunctively so that proof of incapacity as to either ability to appreciate or conform establishes the mitigating circumstance. *State v. Rossi,* 154 Ariz. 245, 251, 741 P.2d 1223, 1229 (1987). Defendant offered expert testimony in support of his claim that his actions were due largely to his chronic alcohol and drug dependency and his impulsive personality. The trial court noted this testimony but nevertheless concluded this mitigating circumstance did not apply. We agree that the record does not support Defendant's mitigation claim under A.R.S. § 13–703(G)(1).

 Defendant offered no evidence that he did not appreciate the wrongfulness of his conduct, and we have found none in the record. Indeed, Defendant's own words belie the notion. After police shot him, Defendant heard the police radio dispatcher ask whether "the bad guy" had been apprehended. Defendant, who was conscious and coherent, stated, "I'm the bad guy." There is no evidence Defendant's capacity to appreciate the wrongfulness of his actions was diminished.

 We also conclude there is insufficient evidence that Defendant's ability to conform his conduct to the law was significantly impaired. The only evidence for this proposi-

---

13. R.T., Feb. 20, 1991, at 166.

14. The state urges also that the A.R.S. § 13–703(F)(3) circumstance was satisfied when, after the murders, Defendant raised his gun toward the two police officers. Our disposition of this issue makes addressing this argument unnecessary. We note, however, that the statutory elements of aggravated assault are not necessarily interchangeable with the requirements for the grave risk of death to another aggravating circumstance. *See Jeffers,* 135 Ariz. at 428, 661 P.2d at 1129.

tion appears in Dr. Allender's trial testimony and Dr. Breslow's sentencing hearing testimony. Neither could directly address Defendant's conduct on the date of the murders because Defendant maintained during their evaluations that he had no recall of the events of the shootings. The essence of Dr. Allender's testimony was that Defendant "appeared to be an individual who would act in an impulsive fashion, responding more to emotions rather than thinking things out." Dr. Breslow testified that Defendant has a narcissistic personality, which means "he tends to be very sensitive to any slight criticisms or rejections and tends to respond with anger inappropriately." In his opinion, Defendant's substance abuse history had a significant impact on his behavior at the time of the killings.[15]

Generally, "a mere character or personality disorder alone is insufficient to constitute a mitigating circumstance." *See, e.g., State v. Brewer*, 170 Ariz. 486, 505, 826 P.2d 783, 802 (1992) (citing cases). Both Dr. Breslow and Dr. Allender stated that Defendant does not suffer from any form of mental illness, but only from a form of personality trait that drug and alcohol abuse often exacerbated. Defendant admitted, however, that he had used no drugs for three days prior to the murders and had consumed only two alcoholic drinks over twelve hours before the murders. This case falls far short of those meeting the A.R.S. § 13–703(G)(1) mitigating circumstance. *Cf., e.g., State v. Jimenez*, 165 Ariz. 444, 459–62, 799 P.2d 785, 797–800 (1990) (defendant suffered from psychotic illness, experienced hallucinations, and heard voices); *Rossi*, 154 Ariz. at 249–51, 741 P.2d at 1227–29 (defendant suffered from cocaine intoxication with delusions and hallucinations).

■■■ We further believe Defendant's impulsive personality and history of substance abuse merit little, if any, independent consideration in mitigation. As noted, Defendant was not under the influence of any intoxicating substance at the time of the murders. *See Bible*, 175 Ariz. at 606, 858 P.2d at 1209. The evidence did not show that Defendant's impulsive personality rendered him unable to control his conduct. Poor impulse control, standing alone, has little mitigating weight. *Brewer*, 170 Ariz. at 506, 826 P.2d at 803.

■■■ We reject Defendant's claim that he was "under unusual and substantial duress, although not such as to constitute a defense to prosecution." A.R.S. § 13–703(G)(2). For this mitigating circumstance to apply, "one person must coerce or induce another person to do something against his will." *State v. Castañeda*, 150 Ariz. 382, 394, 724 P.2d 1, 13 (1986). Moreover, impulse control problems cannot constitute duress. *Id.* There is no evidence Defendant was coerced in any way. Thus, the A.R.S. § 13–703(G)(2) mitigating circumstance does not apply.

■■■ Defendant also argues that he "could not reasonably have foreseen that his conduct in the course of the commission of the offense for which [he] was convicted would cause, or would create grave risk of causing, death to another person." A.R.S. § 13–703(G)(4). This claim is meritless. Defendant intentionally murdered both victims in cold blood, drawing his gun and shooting in a confined area where he knew others were present.

■■■ Despite close scrutiny, the record discloses no other nonstatutory mitigating circumstances. *See Bible*, 175 Ariz. at 606, 858 P.2d at 1209. The trial court correctly noted Defendant's lack of prior felony convictions as a nonstatutory mitigating factor. *See Brewer*, 170 Ariz. at 507, 826 P.2d at 804.

---

**15.** Two factors weaken Dr. Breslow's testimony. First, before examining Defendant but after studying prior evaluations and records, Dr. Breslow stated in a letter to defense counsel that Defendant's "drug and alcohol use was not of an early enough onset and chronicity to result in significant impairment in impulse control or other maturation affecting the ability to process feelings and behavior." This information may have prompted Defendant to modify his responses in his subsequent interview with Dr. Breslow. Second, Dr. Breslow first examined Defendant only nine days before his sentencing hearing. *See Rossi*, 154 Ariz. at 251, 741 P.2d at 1229 (commenting on the significance of psychological evaluations based on interviews long after commission of crime).

72

This carries little weight, however, because Defendant previously pleaded guilty in Nevada to two counts of assault with a deadly weapon, classified there as "gross misdemeanors." Defendant originally was charged with felonies in Nevada, and the seriousness of his conduct compels us to discount this factor.[16] *See Lavers,* 168 Ariz. at 395, 814 P.2d at 352 (prior nonfelony violent acts may rebut claim of no prior felony record).

 Defendant claims as a mitigating factor that he was reared in a dysfunctional family. Nothing in the record substantiates this claim, however, other than his father's alcoholism and his family's periodic moves due to military transfers. Defendant failed, moreover, to demonstrate how his allegedly poor upbringing related in any way to the murders. *See State v. Wallace,* 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989), *cert. denied,* 494 U.S. 1047, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990).

### 3. *State's cross-appeal*

The trial court specifically declined to find as an aggravating circumstance that Defendant murdered the victims in an "especially heinous, cruel or depraved manner." *See* A.R.S. § 13–703(F)(6). In its cross-appeal, the state urges that the trial court erred in failing to find this factor and asks that this court independently make such a finding. Our disposition of the other issues on appeal, however, makes it unnecessary to reach this issue. *See State v. Milke,* 177 Ariz. 118, 129, 865 P.2d 779, 790 (1993) (noting that reviewing courts should not address issues that are unnecessary to disposition of an appeal).

### 4. *Propriety of the death sentences*

 We have independently reviewed the facts establishing the aggravating and mitigating circumstances. *State v. Hill,* 174 Ariz. 313, 330, 848 P.2d 1375, 1392 (1993). We have also reviewed the record for evidence of additional mitigating evidence and have found none. The state proved the exis-

tence of the A.R.S. §§ 13–703(F)(3) and (8) aggravating circumstances beyond a reasonable doubt. After review of the entire record, we conclude there are no statutory and no substantial, nonstatutory mitigating factors. Taken in isolation, Defendant's substance abuse and alleged impulsive personality are not sufficiently substantial to call for leniency. The trial court correctly concluded the aggravating circumstances outweigh the mitigating circumstances. *Cf. Cornell,* 179 Ariz. 314, 878 P.2d 1352. A.R.S. § 13–703(E) requires imposition of the death penalty.

### DISPOSITION

We have examined the entire record for fundamental error pursuant to A.R.S. § 13–4035, *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *State v. Leon,* 104 Ariz. 297, 451 P.2d 878 (1969). We have found none. Accordingly, we affirm Defendant's convictions and sentences.

MOELLER, V.C.J., and CORCORAN, ZLAKET and MARTONE, JJ., concur.

**16.** According to the Nevada presentence report, Defendant parked his motorcycle so it obstructed a truck. The truck owner knocked on Defendant's door and asked him to move his motorcycle. Defendant replied, "Just a minute," then returned and threatened the owner and his girlfriend with a shotgun. Defendant tried to kick the owner, who retreated. Defendant then fired the shotgun at the owner's feet, injuring him.