**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSEPH RUDOLPH WOOD, III,
              *Petitioner-Appellant,*

v.

CHARLES L. RYAN, interim
Director, Arizona Department of
Corrections,
              *Respondent-Appellee.*

No. 08-99003

D.C. No.
4:98-CV-00053-
JMR

OPINION

Appeal from the United States District Court
for the District of Arizona
John M. Roll, District Judge, Presiding

Argued and Submitted
November 18, 2011—San Francisco, California

Filed September 10, 2012

Before: Sidney R. Thomas, Ronald M. Gould, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Thomas

10815

## COUNSEL

Julie S. Hall (argued), Law Offices of Julie S. Hall, Oracle, Arizona; and Kevin C. Lerch, Law Office of Kevin C. Lerch, Tucson, Arizona, for petitioner-appellant Joseph Rudolph Wood, III.

Terry Goddard, Attorney General; Kent Cattani (argued), Chief Counsel, Capital Litigation Section; and Amy Pignatella Cain, Assistant Attorney General, Tucson, Arizona, for respondents-appellees Charles L. Ryan et al.

## OPINION

THOMAS, Circuit Judge:

Joseph R. Wood III, an Arizona state prisoner, appeals the district court's denial of his habeas corpus petition challenging his state convictions for murder and aggravated assault and the imposition of the death penalty. We have jurisdiction under 28 U.S.C. § 2253, and we affirm.

I

Petitioner Joseph Wood shot and killed his estranged girlfriend, Debra Dietz, and her father, Eugene Dietz, on August

7, 1989 at a Tucson automotive paint and body shop owned and operated by the Dietz family. The Arizona Supreme Court described the facts as follows:

> Since 1984, Defendant and Debra had maintained a tumultuous relationship increasingly marred by Defendant's abusive and violent behavior. Eugene generally disapproved of this relationship but did not actively interfere. In fact, the Dietz family often included Defendant in dinners and other activities. Several times, however, Eugene refused to let Defendant visit Debra during business hours while she was working at the shop. Defendant disliked Eugene and told him he would "get him back" and that Eugene would "be sorry."
>
> Debra had rented an apartment that she shared with Defendant. Because Defendant was seldom employed, Debra supported him financially. Defendant nevertheless assaulted Debra periodically. [FN1]. She finally tried to end the relationship after a fight during the 1989 July 4th weekend. She left her apartment and moved in with her parents, saying "I don't want any more of this." After Debra left, Defendant ransacked and vandalized the apartment. She obtained an order of protection against Defendant on July 8, 1989. In the following weeks, however, Defendant repeatedly tried to contact Debra at the shop, her parents' home, and her apartment. [FN2].
>
>> FN1. Debra was often bruised and sometimes wore sunglasses to hide blackened eyes. A neighbor who heard "thuds and banging" within Debra's apartment called police on June 30, 1989, after finding Debra outside and "hysterical." The

responding officer saw cuts and bruises on Debra.

FN2. Defendant left ten messages on Debra's apartment answering machine on the night of Friday, August 4, 1989. Some contained threats of harm, such as: "Debbie, I'm sorry I have to do this. I hope someday somebody will understand when we're not around no more. I do love you babe. I'm going to take you with me."

Debra and Eugene drove together to work at the shop early on Monday morning, August 7, 1989. Defendant phoned the shop three times that morning. Debra hung up on him once, and Eugene hung up on him twice. Defendant called again and asked another employee if Debra and Eugene were at the shop. The employee said that they had temporarily left but would return soon. Debra and Eugene came back at 8:30 a.m. and began working in different areas of the shop. Six other employees were also present that morning.

At 8:50 a.m., a Tucson Police officer saw Defendant driving in a suspicious manner near the shop. The officer slowed her patrol car and made eye contact with Defendant as he left his truck and entered the shop. Eugene was on the telephone in an area where three other employees were working. Defendant waited for Eugene to hang up, drew a revolver, and approached to within four feet of him. The other employees shouted for Defendant to put the gun away. Without saying a word, Defendant fatally shot Eugene once in the chest and then smiled. When the police officer saw this from her patrol car she immediately called for more officers. Defendant left the

shop, but quickly returned and again pointed his revolver at the now supine Eugene. Donald Dietz, an employee and Eugene's seventy-year-old brother, struggled with Defendant, who then ran to the area where Debra had been working.

Debra had apparently heard an employee shout that her father had been shot and was trying to telephone for help when Defendant grabbed her around the neck from behind and placed his revolver directly against her chest. Debra struggled and screamed, "No, Joe, don't!" Another employee heard Defendant say, "I told you I was going to do it, I have to kill you." Defendant then called Debra a "bitch" and shot her twice in the chest.

Several police officers were already on the scene when Defendant left the shop after shooting Debra. Two officers ordered him to put his hands up. Defendant complied and dropped his weapon, but then grabbed it and began raising it toward the officers. After again ordering Defendant to raise his hands, the officers shot Defendant several times.

*State v. Wood,* 881 P.2d 1158, 1165-66 (Ariz. 1994). Wood was arrested and indicted on two counts of first degree murder and two counts of aggravated assault against the police officers who subdued him. *Id.* at 1166.

At trial, Wood conceded his role in the killings, but argued that they were impulsive acts that were not premeditated. *Id.* After a five-day trial, the jury found Wood guilty on all counts. *Id.* at 1169. Following an aggravation and mitigation hearing, the trial court sentenced Wood to imprisonment for the assaults and to death for each murder. *Id.* at 1165.

In 1994, the Arizona Supreme Court affirmed Wood's convictions and sentences. *Id.* The court also independently

reviewed the evidence of aggravating and mitigating circumstances and determined that the trial court correctly concluded that the aggravating circumstances outweighed the mitigating circumstances, thereby supporting the imposition of the death penalty. *Id.* The United States Supreme Court denied certiorari, *Wood v. Arizona*, 515 U.S. 1147 (1995), and Wood's petition for rehearing, *Wood v. Arizona*, 515 U.S. 1180 (1995).

In 1996, Wood filed a state petition for post-conviction review (PCR). The state post-conviction court and the Arizona Supreme Court denied relief. In 2002, Wood filed a second PCR petition. The state post-conviction court and Arizona Supreme Court again denied relief.

In 1998, Wood filed a Petition for Writ of Habeas Corpus in federal district court, followed by the filing of an Amended Petition later that year. In 2006, the district court issued an order on the procedural status of Wood's claims, finding certain claims properly exhausted and ordering merits briefing on those claims and dismissing others as procedurally barred. Order Re: Procedural Status of Claims, Wood v. Schriro, No. CV-98-053-TUC-JMR (D. Ariz. Mar. 21, 2006), ECF No. 63. In 2007, the district court denied Wood's remaining habeas claims on the merits. *Wood v. Schriro*, No. CV-98-053-TUC-JMR, 2007 WL 3124451, at *46 (D. Ariz. Oct. 24, 2007).

We review the district court's denial of Wood's habeas petition *de novo* and its findings of fact for clear error. *Stanley v. Schriro*, 598 F.3d 612, 617 (9th Cir. 2010). We review the denial of Wood's request for an evidentiary hearing for an abuse of discretion. *Id.* Wood filed his habeas petition after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act ("AEDPA") applies. *Woodford v. Garceau*, 538 U.S. 202, 204-07 (2003). To obtain relief under AEDPA, Wood must show that the state court's decision (1) "was contrary to" clearly established federal law as determined by the Supreme Court, (2) "involved an unreasonable application of"

such law, or (3) "was based on an unreasonable determination of the facts" in light of the record before the state court. *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 785 (2011) (quoting 28 U.S.C. § 2254(d)).

## II

The district court correctly determined that Wood was not entitled to habeas relief on his claims that the prosecutor committed prejudicial misconduct in violation of his rights to due process and a fair trial. The district court denied five claims on the merits and concluded that four claims were procedurally barred.

## A

The district court was correct in its denial of Wood's prosecutorial misconduct claims on the merits. Wood argues that the prosecutor committed prejudicial misconduct by: (1) cross-examining a psychologist about whether another doctor had considered hypnotizing or administering amobarbital to Wood; (2) eliciting testimony about a prior arrest, his employment history, and his personal relationships with previous girlfriends and with Ms. Dietz; (3) cross-examining a psychologist about Wood's mental state; (4) cross-examining a lay witness about Wood's mental state; and (5) committing cumulative error.

A prosecutor's actions constitute misconduct if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The "appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.' " *Id.* (quoting *Donnelly*, 416 U.S. at 642). On habeas review, constitutional errors of the "trial type," including prosecutorial misconduct, warrant relief only if they "had

substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993) (internal quotation marks omitted).

1

**[1]** The district court properly denied Wood's claim that the prosecutor committed misconduct by asking Dr. Allender, a psychologist called as an expert witness by the defense, whether he had considered hypnotizing or administering amobarbital to Wood. *Wood*, 2007 WL 3124451, at *6-8. On direct examination, Wood's counsel asked Dr. Allender questions about Wood's alleged inability to remember the shootings. On cross-examination, the prosecutor probed Dr. Allender's understanding of Wood's alleged memory loss. Wood alleges the prosecutor committed misconduct by asking the following line of questions:

> Q: Didn't Dr. Morris [another psychologist who examined Wood] suggest that hypnosis or amobarbital might be ideal to discover whether [Wood] was malingering?
>
> A: He suggested that those might be techniques.
>
> Q: With hypnosis, you place them under hypnosis in order to find out what the truth of the matter was?
>
> A: What the theory would be is if it is an unconscious process, that you can probably do hypnosis or use the sodium amobarbital to get past the conscious defense or unconscious defense mechanisms.
>
> Q: So you didn't, did you attempt, did you request a hypnosis evaluation?
>
> A: I didn't because I didn't, I'm not as convinced about those techniques as Dr. Morris is.

Q: Amobarbital, is that a truth serum?

A: That is what they call it, that is what people have called it along the way.

**[2]** The Arizona Supreme Court denied this claim on direct review. *Wood*, 881 P.2d at 1172-73. In doing so, the Arizona Supreme Court reasonably applied clearly established law. Although Wood argues that the evidence obtained by hypnosis or sodium amobarbital would have been scientifically unreliable, the Arizona Supreme Court acknowledged that "courts generally exclude testimony induced or 'refreshed' by drugs or hypnosis" but determined that the prosecutor's questions about amobarbital and hypnosis in Wood's case were "within the wide latitude permitted on cross-examination" because they were "not intended to impugn [Wood] but to test the basis and credibility of Dr. Allender's opinions concerning whether [Wood] was faking his asserted memory loss at the time of the murders." *Id*. at 1172-73.

Wood also contends that Dr. Allender appeared unqualified because he did not consider this potential evidence, but the record belies this assertion. Dr. Allender testified that he did not perform hypnosis or administer amobarbital because he was not convinced about the reliability of these tests. By questioning the reliability of the tests, Dr. Allender demonstrated his credibility as an expert by showing that a competent psychologist questions the use of methods and practices that do not provide credible results. The prosecutor's questions did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181.

2

**[3]** The district court also correctly denied Wood's claims that the prosecutor committed misconduct by eliciting testimony about Wood's prior arrest, employment history, per-

sonal relationships with previous girlfriends, and self-centered relationship with Ms. Dietz. *Wood*, 2007 WL 3124451, at *8-11. The Arizona Supreme Court addressed the prior arrest and employment history claims. *Wood*, 881 P.2d at 1170-72. However, it did not address the claims about Wood's prior relationships with other girlfriends or his allegedly self-centered relationship with Ms. Dietz, so we must review these two claims *de novo*. *See Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011).

The Arizona Supreme Court reasonably determined that the prosecutor's passing reference to Wood's prior arrest on cross-examination did not violate Wood's right to due process. On direct examination, Dr. Allender testified that he reviewed police reports from the Tucson and Las Vegas police departments. The prosecutor then followed up on cross-examination by asking questions about these reports:

> Q: Directing your attention, you said you had some Las Vegas reports?
>
> A: Yes.
>
> Q: You had police reports from 1979?
>
> A: I believe I did. I would have to flip through and look for it if you want me to.
>
> [The Court]: Maybe if you ask —
>
> Q: Do you recall in 1979 an incident when [Wood] was arrested for some criminal activity?
>
> A: I think I found a report from '79 from Las Vegas.

**[4]** The Arizona Supreme Court determined that this line of questioning did not deprive Wood of a fair trial because "the prosecutor simply asked Dr. Allender to elaborate on the

reports he first mentioned on direct examination. The jury never learned the details of the conduct underlying Defendant's Las Vegas arrest." *Wood*, 881 P.2d at 1172. The court concluded that "[b]ecause Dr. Allender relied on the reports in forming his opinion of Defendant, the prosecutor's cross-examination was proper." *Id.* This brief mention of Wood's prior misdemeanor did not deprive him of a fair trial. The prosecutor referred to the misdemeanor only in passing during the examination and he did not mention it in his closing argument.

The trial court had granted a motion in limine excluding the introduction of this prior misdemeanor into evidence, and the Arizona Supreme Court determined that Wood would have been entitled to a limiting instruction that references to the police reports were admissible only to show the basis of Dr. Allender's opinions had he objected. *Id.* at 1172. But to the extent Wood argues this merits reversal, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

**[5]** The prosecutor's references to Wood's employment history, prior relationships, and self-centered relationship with Ms. Dietz also do not rise to the level of a due process violation. The Arizona Supreme Court properly concluded that the challenged testimony regarding Wood's employment history was merely "perfunctory and undetailed" such that "its admission d[id] not rise to the level of fundamental error." *Wood,* 881 P.2d at 1170. Similarly, the prosecutor's questions that elicited Wood's former girlfriend's testimony that Wood was unfaithful and Margaret Dietz's testimony that Wood was selfish in his relationship with Debra Dietz were also perfunctory and undetailed and they did not violate Wood's due process rights.

3

**[6]** The prosecutor did not commit prejudicial misconduct by cross-examining Dr. Allender about Wood's mental state.

Wood alleges that the prosecutor committed misconduct by improperly raising the issue of Wood's mental state at the time of the incident in the following line of questions:

Q. Let me ask you, sir, I don't know, you are talking about impulsivity here today. Of the defendant. You said the defendant has a trait of acting impulsively?

A. [Dr. Allender] That's my belief, yes.

Q. Under the facts of this case as you understand them, sir, how would a person who was not impulsive have committed this offense?

A. Had it been thought through and premeditated, then I would say it was not impulsive. I see impulsivity as acting without forethought.

Q. Well, how would a non-impulsive person have committed this offense?

A. I think they would have planned it out.

Q. So what you are saying is that this wasn't planned out, from what you know about the facts of this case it wasn't planned?

A. It is hard for me to say whether it is planned. Well, I think Mr. Wood behaved in a general sequence but given his lack of recall for the specific offense, it is hard for me to know whether this was planned out or not.

**[7]** The district court correctly concluded that this line of cross-examination did not warrant the grant of habeas relief. Even if the prosecutor's questions arguably touched on Wood's state of mind at the time of the crimes, Dr. Allender's answers did not. He merely testified that he was not certain

if Wood had planned the shootings. This testimony did not conflict with Wood's impulsivity theory and did not deprive Wood of a fair trial.

4

**[8]** The prosecutor did not commit prejudicial misconduct by cross-examining Mona Donovan, a mutual friend of Wood and Ms. Dietz, about Wood's mental state. On direct examination, Donovan testified that Wood sometimes acted impulsively. On cross-examination, the prosecutor asked Donovan about her pre-trial statement that Wood's anger increased as a situation worsened. Wood argues that the prosecutor committed misconduct by asking the following questions about an incident at Ms. Dietz's apartment:

> Q: When [Wood] trashed the apartment, he trashed the apartment to get some of his possessions and avenge his anger? I was reading the question [defense counsel] asked you on page 11, do you know why he broke in? Answer, to get some of his possessions, to avenge some of his anger by breaking possessions of [Ms. Dietz's]. Do you recall that?
>
> A: Yes.
>
> Q: In fact I think there was a telephonic interview that you gave to a legal assistant in my office on the 9th of October, do you recall when you were asked why he did that, indicating that he probably, he was probably very angry and did it out of spite?
>
> A: I don't recall the telephone conversation.
>
> Q: Does that sound like something you would say?
>
> A: I really don't know, I don't remember.

Q: Would you agree with that statement?

A: That he would do it out of spite?

The Court: Let's quit asking this witness, the witness why this defendant did or didn't know why he did something, there's no way she could know it.

Q: You indicated did you not that he avenged some of his anger by breaking and destroying some possessions of [Ms. Dietz's]?

A: Yes.

The Court: Did you hear what I just said, quit asking her about his mental state. Quit asking her about his mental state.

Q: Well, when you say the word avenge, what do you mean by the word avenge? Do you mean to get revenge?

A: Yeah, I guess so.

Wood contends the prosecutor committed misconduct by asking Ms. Donovan to speculate about Wood's mental state after the trial judge ruled that the question was improper. Because the Arizona Supreme Court did not address this claim on the merits, we review it *de novo*. *Stanley*, 633 F.3d at 860.

**[9]** The district court correctly concluded that the questioning did not violate Wood's right to a fair trial. Although the prosecutor should have dropped this line of questioning after the trial judge admonished him once, the improper follow-up question about Wood's mental state during an event unrelated to the killings was not so prejudicial that it rendered the trial fundamentally unfair. The fact that Wood had vandalized Ms.

Dietz's apartment had already been established. Additionally, the information elicited by the prosecutor was consistent with the defense theory that Wood was impulsive and had anger-control problems. Donovan's testimony regarding Wood's motives in vandalizing the apartment was only tangentially related to the issue of Wood's state of mind at the time of the shootings.

5

**[10]** Finally, the cumulative impact of each of the incidents of alleged prosecutorial misconduct did not violate Wood's right to a fair trial. Even when separately alleged incidents of prosecutorial misconduct do not independently rise to the level of reversible error, "[t]he cumulative effect of multiple errors can violate due process." *United States v. Nobari*, 574 F.3d 1065, 1082 (9th Cir. 2009) (internal quotation marks omitted). However, Wood's allegations of prosecutorial misconduct do not rise to the level of a due process violation even when considered in the aggregate.

B

Wood raises additional prosecutorial misconduct claims that the district court dismissed as procedurally defaulted. Wood claims that the prosecutor committed prejudicial misconduct by: (1) eliciting evidence that Wood was incarcerated while awaiting trial; (2) eliciting false testimony regarding the position of the bullets in the gun's cylinder; (3) impugning defense counsel's motives; and (4) eliciting inflammatory victim impact evidence. We affirm the district court's dismissal of these claims because they were not fairly presented to the state courts.

To fairly present a claim in state court, a petitioner must describe the operative facts supporting that claim. *Davis v. Silva*, 511 F.3d 1005, 1009 (9th Cir. 2008); *see also Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S.

270, 275-78 (1971). Wood concedes that the specific facts underlying these claims were not presented on direct appeal, but he argues that they merely constitute additional particular instances of prosecutorial misconduct that do not fundamentally alter the claim raised on direct appeal. However, a general allegation that a prosecutor engaged in pervasive misconduct is not sufficient to alert a state court to separate specific instances of purported misconduct. *See Picard*, 404 U.S. at 275-78.

In the alternative, Wood argues that the first and last of these claims — that the prosecutor committed misconduct by eliciting evidence that Wood was incarcerated while awaiting trial and eliciting inflammatory victim impact evidence — were not defaulted because they were incorporated by reference to his state PCR petition in his petition for review.

The district court properly determined that these claims were not fairly presented to the Arizona Supreme Court. As the Supreme Court has explained:

> [O]rdinarily, a state prisoner does not "fairly present" a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as the lower court opinion in the case, that does so.

*Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

Additionally, "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman v. Thompson*, 501 U.S. 722, 732 (1991).

**[11]** Arizona law requires that a petitioner present the issues and material facts supporting a claim in a petition for

review and prohibits raising an issue through incorporation of any document by reference, except for appendices. Ariz. R. Crim. P. 32.9(c)(1)(iv). Wood failed to comply with these requirements and thereby failed to fairly present these claims to the Arizona Supreme Court.

Finally, Wood argues that even if his false testimony claim is procedurally defaulted, the district court erred by not reaching the merits of this claim because failure to do so would cause a fundamental miscarriage of justice. To establish a "fundamental miscarriage of justice," Wood must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (internal quotation marks omitted). He must demonstrate that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* As a result, the Supreme Court has noted that this exception "would remain 'rare' and would only be applied in the 'extraordinary case.' " *Id.* at 321.

**[12]** Wood does not meet this burden because considerable evidence of his premeditation was introduced at trial. The morning of the crime, Wood called the shop to determine whether Debra and Eugene Dietz were there and, although he regularly carried a gun with him, he brought more ammunition to the shop than was his habit. *Wood*, 881 P.2d at 1169. He waited to shoot Eugene until after Eugene had hung up the telephone, actively searched for Ms. Dietz, and held her before shooting her, stating, "I told you I was going to do it, I have to kill you." *Id.* Evidence was also introduced detailing Wood's history of violence against Ms. Dietz, as were taped messages in which Wood threatened her life. *Id.* at 1165 nn.1-2. Given this evidence against Wood, it is not more likely than not that no reasonable juror would have found him guilty of premeditated murder beyond a reasonable doubt.

## III

The district court correctly determined that Wood was not entitled to habeas relief on his claims that he was denied

effective assistance of counsel at trial, sentencing, and on appeal.

To establish ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient and that he was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Deficient performance is established when "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. In determining deficiency, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted). To establish prejudice, Wood must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Under AEDPA review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Richter*, 131 S. Ct. at 785.

Ineffective assistance of counsel at sentencing claims are also assessed according to the *Strickland* standard. 466 U.S. at 695. The test for prejudice at sentencing in a capital case is whether "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* AEDPA's "objectively unreasonable" standard also applies to ineffective assistance of counsel at sentencing claims that are considered and denied by a state PCR court. *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002).

A

The district court correctly dismissed Wood's claims that his trial counsel's performance was constitutionally ineffec-

tive. He contends that his trial counsel performed deficiently by inadequately investigating and preparing his mental health defense and failing to object to alleged instances of prosecutorial misconduct.

1

**[13]** Wood's counsel's investigation and preparation of Wood's mental health defense was not constitutionally ineffective. At trial, Wood conceded his role in the killings but argued that they were not premeditated because he had acted impulsively. *Wood*, 881 P.2d at 1166. Wood alleges that his counsel rendered ineffective assistance in asserting an impulsivity defense by failing to provide Dr. Allender with sufficient background material to testify effectively about his mental health at trial. The record indicates that counsel adequately prepared Dr. Allender for his testimony. At counsel's request, Dr. Allender thoroughly examined Wood over the course of two days. During these examinations, Dr. Allender administered several psychological tests and discussed Wood's drug and alcohol abuse, hospitalization history — including his history of head injuries — and the incident itself. Dr. Allender also reviewed psychological evaluations by Dr. Boyer, Dr. Morris, and Dr. Morenz, the three other mental health experts who also examined Wood. Each of these evaluations discussed Wood's personal history of alcohol abuse, his suicide attempts, and his head injuries. Given this background preparation, Dr. Allender was prepared to testify about Wood's mental state.

Furthermore, Wood has not demonstrated prejudice. Counsel presented an impulsivity defense and Wood has not demonstrated a reasonable probability that a different or more comprehensive presentation of that defense would have resulted in a different verdict, especially in the face of the overwhelming evidence of premeditation. *See Williams v. Calderon*, 52 F.3d 1465, 1470 (9th Cir. 1995). Thus, the PCR

court did not unreasonably apply *Strickland* when it rejected this claim.

2

**[14]** The district court properly rejected Wood's claims that his trial counsel was constitutionally ineffective for failing to object to the alleged incidents of prosecutorial misconduct. The PCR court did not unreasonably apply *Strickland* in determining that Wood failed to demonstrate prejudice. Many of counsel's decisions not to object at trial were consistent with his presentation of an impulsivity defense. For example, evidence elicited by the prosecutor concerning instances of Wood's erratic behavior was consistent with the strategy of offering Wood's impulsive personality as a defense to the element of premeditation. *See Wood,* 881 P.2d at 1170. Additionally, the jury's finding of premeditation was supported by strong evidence at trial. *See Wood,* 881 P.2d at 1169. In light of this evidence, Wood has not demonstrated a reasonable probability that the result of the trial would have been different had defense counsel objected to the alleged instances of prosecutorial misconduct.

B

**[15]** The district court also properly dismissed as procedurally defaulted Wood's claim that his trial counsel was constitutionally ineffective for failing to impeach three witnesses. Wood claims that his trial counsel rendered ineffective assistance by failing to impeach Anita Sueme, Eric Thompson, and Donald Dietz for allegedly giving prior statements inconsistent with their trial testimony. We affirm the district court's dismissal of this claim because it was not fairly presented to the state courts.

To fairly present a claim in state court, a petitioner must describe the operative facts supporting that claim. *Davis*, 511 F.3d at 1009; *see also Anderson*, 459 U.S. at 6; *Picard*, 404

U.S. at 275-78. Wood concedes that he did not raise these particular claims on direct appeal, but as with some of his claims of prosecutorial misconduct, *see supra* Section II.B, he argues that they merely constitute additional particular instances of ineffective assistance of counsel that do not fundamentally alter the claim raised on direct appeal. However, as with the claims of prosecutorial conduct discussed previously, a general allegation of ineffective assistance of counsel is not sufficient to alert a state court to separate specific instances of ineffective assistance. *See Picard*, 404 U.S. at 275-78.

### C

The district court did not err in denying Wood's claim that his counsel failed to effectively assist him at sentencing. Specifically, Wood contends that his counsel failed to prepare and present evidence of his diminished capacity, failed to prepare him for his pre-sentence interview, and failed to assert his military service as a mitigating factor.

### 1

Wood argues that his counsel failed to properly marshal evidence of Wood's personality changes following head injuries and his social background, including his alcoholism and mental illness. However, information regarding each of these issues was put before the trial court. Evidence of Wood's reported head injuries was presented through Dr. Allender's testimony during the guilt stage of the trial. Dr. Allender testified that Wood's head injuries did not cause a significant behavioral change. Wood's head injuries were also discussed in the other mental health experts' Rule 11 reports.

[16] Counsel was not ineffective for failing to present additional evidence and argument at sentencing about Wood's head injuries because it had already been presented at trial. *See Bell*, 535 U.S. at 699-700. Additional evidence of Wood's social background, including his history of substance abuse,

was also presented at sentencing by Dr. Breslow, a psychiatric chemical dependency expert. Dr. Breslow reviewed Wood's medical and military records, statements from trial witnesses, and the mental-health evaluations prepared by Dr. Morris, Dr. Morenz, and Dr. Allender. He testified that Wood suffers from alcohol, stimulant, amphetamine, and cocaine dependencies. He explained that Wood's substance abuse had a profound effect on Wood's personality by impairing his judgment, making him more impulsive, and likely impacting his behavior at the time of the killings. Thus, counsel developed and presented this mitigating evidence in detail and the PCR court reasonably rejected Wood's claim.

**[17]** Wood also argues that his counsel never requested or acquired an in depth neurological evaluation. However, the PCR court found that Wood's counsel requested a brain mapping test, on Dr. Breslow's recommendation, although that request was denied by the trial court. Counsel attempted to acquire the recommended evaluation and his failure to obtain it does not render his performance constitutionally ineffective.

2

**[18]** The district court properly concluded that the PCR court reasonably denied Wood's ineffective assistance of counsel claim that his counsel failed to prepare him for his pre-sentence interview. Wood argues that he was not adequately prepared because he did not express remorse for his actions in his interview with the probation officer. But Wood included expressions of remorse in a letter delivered by counsel to the sentencing judge. The record also indicates that the court did not consider Wood's lack of remorse in the presentence report as a factor in his sentence. Therefore, Wood does not demonstrate prejudice from counsel's performance because he "has failed to show that the information relative to remorse contained in the pre-sentence report had any effect on the sentencing court's decision to impose the death penalty." *Clark v. Ricketts*, 958 F.2d 851, 857-58 (9th Cir. 1991).

3

**[19]** The district court properly concluded that the PCR court reasonably denied Wood's ineffective assistance of counsel claim on the ground that his counsel did not explicitly present his military service as a mitigating factor in sentencing. Counsel presented Wood's military records for consideration by the trial court and the sentencing judge is presumed to have known and applied the law correctly, which meant giving consideration to this mitigating evidence.

4

The district court did not err in concluding that the PCR court reasonably denied Wood's claim that the cumulative effect of trial counsel's deficiencies entitles him to a new trial and sentencing proceeding. "Separate errors by counsel at trial and at sentencing should be analyzed together to see whether their cumulative effect deprived the defendant of his right to effective assistance." *Sanders v. Ryder*, 342 F.3d 991, 1001 (9th Cir. 2003) (citations omitted). Wood's assertion of cumulative error fails because his individual claims of his counsel's errors at trial and sentencing are not supportable, and they do not entitle him to relief even when aggregated.

D

The district court correctly denied Wood's claim that he was denied effective assistance of counsel because one of his appellate attorneys had an alleged conflict of interest, but did not withdraw from representation. Wood did not raise this particular ineffective assistance claim on direct appeal or in his PCR proceedings, so the district court dismissed it as unexhausted and procedurally defaulted.

IV

**[20]** The district court properly denied Wood's claim that the state trial court erred by denying Wood's request for fund-

ing to obtain a neurometric brain mapping test. The district
court dismissed this claim as procedurally defaulted because
Wood did not fairly present it to the state courts. Wood con-
tends that he properly exhausted this claim by presenting it to
the Arizona Supreme Court on direct appeal and by present-
ing it in post-conviction proceedings. He also contends that
the Arizona Supreme Court necessarily considered this claim
during its independent sentencing review.

Wood did not exhaust his claim on direct review. Wood
discussed the denial of the funding request only in his descrip-
tion of the trial court's proceedings; he did not argue that the
denial of the funding request violated his constitutional rights.
This passing reference was not sufficient to fairly alert the
Arizona Supreme Court to this claim. *See Castillo v. McFad-*
*den*, 399 F.3d 993, 1002-03 (9th Cir. 2004).

Wood also did not properly exhaust this claim in post-
conviction proceedings. Although Wood raised this claim in
the PCR petition, he did not include it in his petition for
review to the Arizona Supreme Court. Wood argues that he
incorporated his PCR petition by reference into his petition
for review before the Arizona Supreme Court. Again, as dis-
cussed in Part II.B of this opinion, this incorporation by refer-
ence was not a sufficient method of fairly presenting this
claim to the Arizona Supreme Court. *See Baldwin*, 541 U.S.
at 32.

The Arizona Supreme Court's independent sentencing
review did not serve to exhaust this claim. In capital cases, the
Arizona Supreme Court independently reviews the facts that
established the aggravating and mitigating factors in order to
justify the sentence imposed. *Correll v. Ryan*, 539 F.3d 938,
951 (9th Cir. 2008). However, this independent review does
not necessarily exhaust all claims of constitutional error. *See*
*Moormann v. Schriro*, 426 F.3d 1044, 1057-58 (9th Cir.
2005). We agree with the district court that the Arizona
Supreme Court would not necessarily consider whether the

trial court's denial of a funding request limited Wood's ability to present mitigating evidence.

V

**[21]** Finally, the district court did not abuse its discretion by denying Wood's request for an evidentiary hearing, evidentiary development, and expansion of the record. During PCR proceedings, Wood requested, but did not receive, an evidentiary hearing on his ineffective assistance of counsel claims. The district court concluded that Wood may have diligently attempted to develop the factual basis for his claims, but the district court still denied these requests under 28 U.S.C. § 2254(e)(2) after determining that Wood had not alleged the existence of disputed facts which, if true, would entitle him to relief.

Wood contends that he was prejudiced by counsel's deficient handling of mental health evidence at the guilt and sentencing stages of trial. However, the record details counsel's performance, including his effort to investigate, prepare, and present a guilt-stage defense based on Wood's character trait of impulsivity. Therefore, Wood is not entitled to an evidentiary hearing because his ineffective assistance of counsel claims can be "resolved by reference to the state court record." *Totten v. Merkle,* 137 F.3d 1172, 1176 (9th Cir. 1998) (citations omitted). Furthermore, Wood is not entitled to an evidentiary hearing or additional discovery in federal court because this ineffective assistance of counsel claim is governed by 28 U.S.C. § 2254(d)(1), as it was adjudicated on the merits in the PCR proceedings. Review of such claims "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388, 1398 (2011).

## VI

**[22]** For these reasons, we therefore affirm the district court's denial of Wood's habeas petition and request for an evidentiary hearing.

**AFFIRMED.**